```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5     UNITED STATES OF AMERICA        )
                                       )
 6     v.                              )    CRIMINAL ACTION NO.
                                       )         2:20cr11
 7     XAVIER HOWELL,                  )
                                       )
 8            Defendant.               )
                                       )
 9   - - - - - - - - - - - - - - - - - -

10

11

12                  TRANSCRIPT OF PROCEEDINGS
                       (Motion Hearing)

13                     Norfolk, Virginia

14                    September 4, 2020

15

16   BEFORE:  THE HONORABLE JOHN A. GIBNEY
                  United States District Judge
17

18

19   APPEARANCES:

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew C. Bosse
21                 John F. Butler
                   Assistant United States Attorneys
22                 Counsel for the United States

23            ZOBY & BROCCOLETTI
              By:  James O. Broccoletti
24                 Randall Leeman, Jr.
                   Counsel for the Defendant

25
```

```
1                           I N D E X

2    GOVERNMENT'S
     WITNESSES                                           PAGE
3
      ADAM BEHA
4          Direct Examination By Mr. Butler                4
           Cross-Examination By Mr. Broccoletti           31
5          Redirect Examination By Mr. Butler             50
      KENNETH BYRD
6          Direct Examination By Mr. Butler               53
           Cross-Examination By Mr. Broccoletti           61
7          Redirect Examination By Mr. Butler             69
      CLINTON ROMBS
8          Direct Examination By Mr. Butler               71
           Cross-Examination By Mr. Broccoletti           77
9

10

11                        E X H I B I T S

12   GOVERNMENT'S
     NO.                                                 PAGE
13
      1          NCIC/VCIN warrant                        15
14    2          CPD policy                               15
      3          VCIN manual                              15
15    4          Photos from traffic stop                 15

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

3

```
 1              (Proceedings commenced at 11:01 a.m.)
 2              THE CLERK:  Criminal Case Number 2:20cr11, the
 3    United States of America vs. Xavier Howell, also known as
 4    "X."
 5              Mr. Butler, Mr. Bosse, is the government ready to
 6    proceed?
 7              MR. BUTLER:  Good morning, Your Honor.  John Butler
 8    for the United States, along with Andrew Bosse.  Good to see
 9    you, sir.
10              THE COURT:  All right.  Good to see both of you.
11              THE CLERK:  Mr. Broccoletti, Mr. Leeman, is your
12    client ready to proceed?
13              MR. BROCCOLETTI:  Good morning, Your Honor.
14    Pleasure to see you.  Present and ready.
15              THE COURT:  Good to see you.
16              Good morning, counsel.  Good morning, Mr. Howell.
17              We're here today on a Motion to Suppress that has
18    been filed by the defendant in this case.  Does anybody want
19    to say anything before we start hearing evidence on this?
20              MR. BUTLER:  No, Your Honor, other than we'll be
21    calling three witnesses this morning.
22              THE COURT:  All right.  Do you have anything you
23    want to say before they start calling witnesses?
24              MR. BROCCOLETTI:  Other than to separate the
25    witnesses, Your Honor, I think our brief sets forth what the
```

A. Beha - Direct

```
 1   issues are.
 2          THE COURT:  All right.  Are the witnesses -- I think
 3   I just passed them out in the hall on the way in here.
 4          MR. BUTLER:  Yes, Your Honor.
 5          THE COURT:  All right.  So they'll be ordered to
 6   stay out there until they testify.
 7          So call your first witness.
 8          MR. BUTLER:  The United States calls Detective Adam
 9   Beha.
10          (The witness was affirmed.)
11          ADAM BEHA, called by the Government, having been
12   first duly affirmed, was examined and testified as follows:
13                    DIRECT EXAMINATION
14   BY MR. BUTLER:
15   Q.  Good morning.  Could you please state your name.
16   A.  Yes, sir.  It's Adam Beha, B-e-h-a.
17   Q.  By whom are you employed?
18   A.  By the Chesapeake Police Department, and I'm assigned to
19   the Vice and Narcotics Unit as a detective.
20   Q.  How long have you been employed by the Chesapeake Police
21   Department?
22   A.  Just over ten years.
23   Q.  Other than your role in the Vice and Narcotics Unit, are
24   there other roles you play with any other agencies?
25   A.  Yes, sir.  I also serve as a task force officer with the
```

A. Beha - Direct

1  Federal Bureau of Investigation, and I've done so for
2  approximately the past four years.
3  Q.  In your ten-year career, about how many narcotics cases
4  have you investigated?
5  A.  Probably more than a thousand, sir.
6  Q.  And of those thousand, approximately how many federal
7  defendants?
8  A.  Approximately 100.
9  Q.  I want to direct your attention now to September 26 of
10  2019.
11          What were you and your partner investigating at that
12  time?
13  A.  My partner and I received information from a reliable
14  confidential informant concerning an ongoing investigation.
15  The informant had received information that a target of an
16  investigation from out of state was allegedly trafficking a
17  significant amount of controlled substances into the Eastern
18  District of Virginia and specifically into Chesapeake,
19  Virginia.
20  Q.  And to be clear, that out-of-state target was not the
21  defendant?
22  A.  Correct.
23  Q.  All right.  Tell the Court why this confidential
24  informant -- you called him reliable.  Why is he or she
25  reliable?

A. Beha - Direct

1   A.  The informant has consistently been providing information

2   for approximately the past five years, both on the state and

3   federal level.  This information was independently

4   corroborated by various investigative measures and led to the

5   arrests and convictions of subjects, again, both on the state

6   and federal level.

7   Q.  And this reliable confidential informant who told you an

8   out-of-state drug trafficker was coming to Chesapeake -- to

9   do what?

10  A.  To traffic or transport a large amount of controlled

11  substances into Chesapeake and, thereby, distribute it to

12  other distributors.

13  Q.  Specifically where was this target going to be meeting

14  other distributors?

15  A.  Later in the evening, the informant received additional

16  information and relayed it to myself and my partner that

17  specifically the target would be staying at the Aloft Hotel

18  in the Greenbrier section of the city of Chesapeake.

19  Q.  Other than having the information about the Aloft Hotel,

20  did your reliable confidential informant provide you any

21  other descriptive information?

22  A.  Yes.  The informant advised that the subject would be

23  driving a dark-colored or black sports utility vehicle with

24  out-of-state tags and would likely be accompanied by or the

25  vehicle driven by an unknown African-American female.

Carol L. Naughton, Official Court Reporter

———————————A. Beha - Direct———————————

1   Q.  Based on your training and experience, can you talk about

2   some of the methods that are commonly used by drug

3   traffickers?

4   A.  Yes, sir.  Based on both training and experience, it's

5   very common, especially when it's a trafficker or distributor

6   not from the locality where these drugs are being

7   distributed, to utilize rental cars.  That's both to remain

8   anonymous and avoid detection by law enforcement; thereby, if

9   a law enforcement officer performs a registration check on a

10  rental vehicle, it comes back to the registered rental agency

11  rather than the individual.

12         The same applies for hotels, commonly.  They'll be

13  used for short stays and duration.  It's not uncommon for

14  them not to be in the subject's name, again, to avoid

15  detection by law enforcement and other distributors.

16  Q.  When you had this information from the confidential

17  informant about a black SUV with out-of-state tags, did he

18  also describe whether or not it was going to be a rental

19  vehicle or personally owned vehicle?  Did that come up?

20  A.  Yes.  It was advised that it would be a rental vehicle

21  with out-of-state tags.

22  Q.  And based on your experience as a narcotics detective in

23  Chesapeake, what can you tell the Judge about the Aloft

24  Hotel?

25  A.  Yes, Your Honor.  Myself and my unit have investigated

———————A. Beha - Direct———————

1   numerous drug-involved offenses, specifically in that

2   corridor, but also at that hotel.  Myself, I've been involved

3   in the investigation and arrest of individuals/distributors

4   at that hotel resulting in interviews about why they prefer

5   that hotel, on multiple occasions.

6          THE COURT:  Why do they prefer that hotel?

7          THE WITNESS:  It's interesting.  It's consistent

8   among these folks that they prefer this hotel because it has

9   a common area, both indoor and outdoor, with pool tables, a

10  bar.

11         And it's been explained that a distributor prefers

12  to do their interactions in that area, between

13  distributor-and-distributor selling, because they hide in

14  plain sight; whereas, they don't want the subject to go to

15  the room because they don't want the other subject to know

16  where there are additional narcotics or currency or things

17  like that are located.

18  BY MR. BUTLER:

19  Q.  Why would that be a concern?

20  A.  Based on training and experience and, specifically in

21  this instance, interviews, drug distributors are more

22  cautious of being robbed by other drug dealers than they are

23  about detection of law enforcement.

24  Q.  You mentioned that you've had previous arrests,

25  drug-related arrests, at this hotel.  Have you had actual

———————A. Beha - Direct———————

1   drug seizures from this hotel?

2   A.   Yes.  Multiple occasions.

3   Q.   Based on your tip from the reliable confidential

4   informant, what did you and your partner decide to do?

5   A.   We decided -- and if I may expand on what -- we received

6   more information later in the evening that not only was the

7   distributor going to be staying at this hotel and bringing

8   controlled substances into the area to distribute, we did

9   receive specific information that other distributors were

10  going to meet at the same hotel for that distribution to

11  occur; not just that the drugs were going to be there but

12  that the transactions were going to take place there.

13          So my partner and I decided to respond early the

14  next morning.  My partner arrived at approximately 7:00 a.m.

15  to simply attempt to independently corroborate the

16  information from the informant.  Doing surveillance

17  initially, the only way we thought we could do that was

18  attempt to find a vehicle matching the description, which we

19  did not.

20  Q.   So because in the early morning hours you did not find

21  the vehicle matching the description, what next step did you

22  take?

23  A.   We continued surveillance for several hours.  Just before

24  10:00 a.m., my partner went into the hotel and requested a

25  hotel registry, in attempt to see if we not only observed the

A. Beha - Direct

1    subject's name that we knew that was supposedly bringing

2    these drugs from out of state but because of the specific

3    information about other narcotics distributors locally

4    possibly being there, to look for names that we already knew

5    based on our experience in the area.

6    Q.   And what did you find in your review of the registry?

7    A.   Immediately recognized two individuals that we knew,

8    based on interviews and previous investigations, were

9    previously involved in drug distribution and trafficking,

10   including -- Mr. Howell was one of those individuals.

11   Q.   Okay.  I want you to tell the Judge what you knew about

12   Mr. Howell.  At that point, on September 27th, that morning,

13   what did you already know about him?

14   A.   Yes, Your Honor.  I first became familiar with Mr. Howell

15   as part of an Organized Crime Drug Enforcement Task Force

16   investigation led by the FBI approximately five years ago,

17   and I first became aware of his name and, shortly thereafter,

18   of his involvement while the investigative team was

19   completing controlled buys, which eventually led to a federal

20   indictment and guilty plea of distribution of cocaine from a

21   business.  We were doing controlled buys out of a business in

22   Portsmouth, Virginia.

23   Q.   What association did that business have to this

24   defendant?

25   A.   When we began more thoroughly looking into the business

─────A. Beha - Direct─────

1    and its involvement, we located that Mr. Howell was listed as

2    the director of the business.

3    Q.   Where a controlled purchase took place?

4    A.   Yes.

5    Q.   Other than this controlled purchase happening in a

6    business that the defendant was associated with, did you have

7    any other information about the defendant?

8    A.   Yes.  As the investigation progressed, I completed a

9    criminal history inquiry on Mr. Howell.  I learned that

10   Mr. Howell had previously been arrested for an offense

11   related to trafficking controlled substances into Virginia.

12            THE COURT:  So you did a VCIN check on him?

13            THE WITNESS:  Yes, sir.  Approximately five years

14   ago.

15            THE COURT:  Five years ago you did this check?

16            THE WITNESS:  Originally.  Originally.

17            THE COURT:  All right.  You kind of lost me there.

18            MR. BUTLER:  I'll clear it up, Your Honor.

19   BY MR. BUTLER:

20   Q.   So we're not talking about September 27th.  We're just

21   for the --

22            THE COURT:  This is when you found this business?

23            THE WITNESS:  Yes, sir.  A separate investigation,

24   Your Honor.

25   BY MR. BUTLER:

A. Beha - Direct

1    Q.   And other than running his criminal history back then,
2    was there other information that you had other than this
3    controlled purchase?
4    A.   Yes.  As that original investigation progressed resulting
5    in the federal plea, multiple interviews were done with
6    informants that had knowledge on that investigation.
7    Q.   Were these informants different than the one that's
8    talking to you on September 26th?
9    A.   Yes.  No relation.  It was the previous investigation.
10   Q.   Just so I'm clear, there's multiple confidential
11   informants prior to September of 2019 that are talking about
12   the defendant's involvement in drug trafficking?
13   A.   Yes.  One specifically was aware of the controlled
14   substances being distributed from the business, and one was
15   aware of Mr. Howell's involvement and actually observed him
16   with controlled substances.
17   Q.   So now let's fast-forward to the morning of
18   September 27th.  Did you also run the defendant's criminal
19   history that morning?
20   A.   I did, after observing his name on the hotel registry.
21            THE COURT:  Let me get something straight here.
22            This business with the multiple defendants or the
23   multiple informants talking to you, was that back five years
24   ago when you were looking at the business, or did that happen
25   over time?

A. Beha - Direct

1          THE WITNESS:  Yes, sir.  Originally I learned his

2     name five years ago, and within the following years leading

3     up to the conclusion of that investigation, those informants

4     were interviewed as a part of that.  It wasn't exactly five

5     years ago when I interviewed the informants.  It's after

6     that.

7          THE COURT:  Well, was this something that was an

8     ongoing thing that you had?

9          THE WITNESS:  It was, sir, but the interview of

10    those informants would have been approximately a year to two

11    years, so after we originally -- becoming aware of it.

12         THE COURT:  About four years ago?

13         THE WITNESS:  Yes, sir.

14    BY MR. BUTLER:

15    Q.  And tell the Judge, in this line of questioning here,

16    were you, in fact, investigating the defendant?  Is he

17    somebody you were following?

18    A.  I was not only investigating the defendant, but as a

19    result of the original investigation, the defendant's

20    photograph has been in front of my and my partner's desk as

21    part of a big board and ongoing criminal conspiracy

22    investigation, again not with just the defendant, but many

23    people who were on the business listed with him that were

24    still local and their actions were continuing.

25    Q.  And were you tracking his social media?

A. Beha - Direct

1    A.  Yes, consistently, since I originally became aware of his

2    actions.

3    Q.  This is all before September 26th?

4    A.  Yes.

5    Q.  All before this confidential informant gave you this tip?

6    A.  Yes.

7    Q.  Now we're back to the morning of September 27th.  You see

8    the name on the registry.  What does that cause you to do

9    next?

10   A.  Well, I felt like part of the statement from the

11   informant had been corroborated, the part that stated that

12   it's possible that other distributors may be present at the

13   hotel.  So at that point, I completed an additional VCIN or

14   NCIC inquiry on Mr. Howell, not just Mr. Howell, but the

15   other subject and several other subjects on the registry, in

16   an attempt to confirm if possibly they were involved as well.

17   Q.  When you did that -- and you mentioned earlier about a

18   drug trafficking arrest.  Any arrests outside the

19   Commonwealth of Virginia?

20   A.  Yes.  If I recall correctly, I believe there was in

21   New Jersey and Colorado and Georgia, I believe.

22   Q.  But let's get to the crux of what this case is about.

23        MR. BUTLER:  I'd like the court security officer's

24   assistance to hand the witness -- I'm just going to go

25   ahead -- defense counsel has all four of these.  I'm going to

———————————————A. Beha - Direct———————————————

1   give you Government's Exhibit 1 through 4, and I want to

2   focus first on Government's Exhibit 1, and I'm going to put

3   this on -- absent objection from the defense, I'm going to

4   offer it at this time.

5          MR. BROCCOLETTI:  No objection.

6          THE COURT:  Exhibits 1 through 4?  Are you offering

7   all four of them?

8          MR. BUTLER:  Yes.

9          THE COURT:  You have no objection to any of them?

10          MR. BROCCOLETTI:  No, Your Honor.

11          THE COURT:  All right.

12          (Government Exhibits 1 through 4 were received in

13   evidence.)

14   BY MR. BUTLER:

15   Q.  Government Exhibit 1, what are we looking at here?

16   A.  This is a caution warrant -- possible outstanding warrant

17   notification, and this was located at the end of the criminal

18   history inquiry, or the NCIC/VCIN inquiry that I completed.

19          THE COURT:  Do you happen to have a copy of this?

20   This is virtually impossible for me to read.  Do you have a

21   paper copy of it?

22          MR. BUTLER:  Yes, Your Honor.

23          THE COURT:  Never mind.  You hold on to it because

24   you're going to need it, but in future cases, this is a lousy

25   monitor.

─────────────────────A. Beha - Direct─────────────────────

1          THE CLERK:  It's not very clear, Mr. Butler.

2          THE COURT:  Did you bring two copies?

3          MR. BUTLER:  I have another one here.

4          THE COURT:  I can struggle along with this.

5          MR. BUTLER:  I'll just ask some questions here.

6    BY MR. BUTLER:

7    Q.  What was the time that you ran --

8          MR. BROCCOLETTI:  Judge, you can have my copy.  I

9    have more than enough paper.  You can have mine if you want.

10          THE COURT:  Was this attached to your brief?

11          MR. BUTLER:  It is, yes, Your Honor.

12          THE COURT:  Then I've seen it.  Let me just get the

13   copy that's attached to the brief.

14          MR. BUTLER:  And it should be in the same order,

15   too.  It should be --

16          THE COURT:  Okay.  So this is -- I've got it.  All

17   right.  Exhibit 1 is -- I'm sorry.  Detective Beha, you were

18   saying what this exhibit is.

19          THE WITNESS:  Yes, sir.  It is a caution or a

20   possible wanted subject notification.  And, Your Honor, this

21   was listed at the bottom of the NCIC or VCIN criminal history

22   inquiry.

23   BY MR. BUTLER:

24   Q.  And, Detective Beha, I want to direct your attention to

25   the bottom --

─────────A. Beha - Direct─────────

```
 1            THE COURT:  So this is a printout of a computer
 2     page?
 3            THE WITNESS:  I actually took a photograph of it at
 4     the time I saw it.
 5            THE COURT:  Okay.
 6            THE WITNESS:  So that my partners would know what I
 7     saw.
 8     BY MR. BUTLER:
 9     Q.  What time did you run this?
10     A.  It actually says it at the bottom, sir.  It says 0959, or
11     9:59 a.m.
12     Q.  And it says here "Wanted - confirm that want" --
13            Is that "warrant"?
14     A.  Yes, sir.
15     Q.  -- "is still outstanding."  And then it has a note here
16     to notify the Sheriff's Office of Crawfordville, Georgia.
17            Did you do that?
18     A.  No, sir.  I'm not permitted to do so according to
19     Chesapeake Police policy.
20     Q.  Why is that?  Explain that in more detail to the Judge.
21     A.  Well, it's for two reasons.  Initially, policy states
22     that an officer or a detective must have contact or have a
23     subject detained before that inquiry can be completed.
24            THE COURT:  Your policy says that?
25            THE WITNESS:  Yes, sir.
```

———————————A. Beha - Direct———————————

```
 1              THE COURT:  Who wrote that?

 2              THE WITNESS:  I don't know, Your Honor.

 3              THE COURT:  Is that in the law somewhere, to your

 4     knowledge?

 5              THE WITNESS:  Not to my knowledge, Your Honor.

 6              MR. BUTLER:  Your Honor, that's the next exhibit

 7     we're going to go over, the policy and procedure, but before

 8     I get into that question, just to wrap this up:

 9     BY MR. BUTLER:

10     Q.  Is there a difference between the information that you

11     see at your office on this computer and the information that

12     a patrol officer sees in their patrol car?

13     A.  There is.  The main reason for that is a patrol officer

14     has an issued computer or a laptop, and it has a system on it

15     that's called Mobile.  And it is slightly different.

16              It will -- for example, on what we're reading here,

17     Your Honor, it doesn't state anything about extradition or

18     anything like that.  Theirs actually will.  Whereas, the

19     opposite is true that what they're seeing will not be as

20     descriptive as what you're seeing in front of you about

21     Crawfordville, Georgia, or something like that.

22              THE COURT:  The officer in the car gets some

23     information about extradition?

24              THE WITNESS:  It will, possibly.  Usually, it will,

25     yes, Your Honor.
```

A. Beha - Direct

1       THE COURT:  Well, did it in this case?

2       THE WITNESS:  I didn't note it at the time, but,

3   yes, it did.

4   BY MR. BUTLER:

5   Q.  Let me show you -- the Judge had asked you about this

6   policy.  This is Government's Exhibit 2, and this is

7   Document 75-2 that was filed with our motion.

8       What are we looking at here, Detective Beha?

9   A.  This is the policy that guides officers' interactions

10  with possible wanted subjects.

11  Q.  And, specifically, I want to turn to Page 2.  At the

12  bottom here is a Section I:

13      "The following procedures shall be followed upon an

14  officer receiving a 'hit' on their laptop, which indicates a

15  warrant exists for a person within their custody or with whom

16  they are in contact with."

17      Is this discretionary, or is this something

18  mandatory that you have to file as a Chesapeake detective?

19  A.  It's mandatory, sir, guided by the word "shall."

20  Q.  What is "hit"?

21  A.  It's an alert, like we were observing, that I took a

22  photograph of.

23  Q.  And is this a policy that you were familiar with on

24  September 27th of 2019?

25  A.  Yes.  Officers are instructed this in the academy, and it

A. Beha - Direct

1    is -- they're displayed this by field training officers and

2    guided to follow this policy throughout their career when

3    interacting with a possible wanted subject.

4    Q.  And tell the Judge, when you contact a dispatcher to

5    confirm the status of a warrant, what is the first thing the

6    dispatcher is going to ask you?

7    A.  Is the subject detained or in custody?

8    Q.  Why?

9    A.  My understanding is they do not want to risk wasting

10   resources, either by the agency that's asking or by the

11   agency that entered it as being contacted, if there's no way

12   that, if it's active, a person will be arrested.

13   Q.  I want to show you Page 3, paragraph 3.

14          "If the warrant is from another jurisdiction, ECC

15   personnel shall send a VCIN Hit Confirmation to the

16   appropriate jurisdiction and make telephone contact when

17   necessary."

18          Is this something that you're allowed to do?

19   A.  No.  And that's actually the second part to my answer to

20   your original question of why didn't I call Georgia.  It's

21   because our policy requires that the emergency communication

22   personnel do it.  These days --

23          THE COURT:  Is that what ECC is?

24          THE WITNESS:  Yes, sir, Emergency Communication

25   Center.

A. Beha - Direct

1              And these days, with technology advances, it's all
2      done via computer alert to each other, contact with different
3      agencies across the country.
4      BY MR. BUTLER:
5      Q.  Now I want to show you Government's Exhibit 3.
6              THE COURT:  Well, wait a second.
7              As part of your training, what does the ECC
8      personnel ask the issuing jurisdiction?  What happens in that
9      context?
10             THE WITNESS:  I'm not exactly privy to that very
11     often.  I know it involves different codes and acronyms and
12     that the agency that entered it has a certain amount of time
13     to respond because they know that a person is detained, but
14     it is a way to confirm or deny, in this case if it's an
15     out-of-state warrant, as to if that agency elects for the
16     person to be arrested and extradited.
17     BY MR. BUTLER:
18     Q.  Explain, though, in a case where potentially somebody is
19     non-extraditable, why are you still required to contact the
20     originating state?
21     A.  Not only is it policy, it's common practice, and the
22     reason is that -- and it actually states it in part of VCIN
23     policy, and NCIC, that the status can actually change.  I
24     personally have encountered that in two different ways:
25             I've encountered it where a warrant will say

A. Beha - Direct

1   non-extraditable, and you go through the procedure and ECC

2   contacts the involved jurisdiction and the status has changed

3   that they now wish to extradite.

4          And I've actually seen it the opposite way where it

5   says, clearly, extraditable, and one of two things has

6   happened; the agency has made a mistake and forgot to remove

7   the warrant, that the subject's already been served, they're

8   not even wanted anymore, or that they now wish to extradite.

9   They possibly got additional charges or --

10  Q.  You've seen it both ways?

11  A.  Both ways.

12  Q.  Let's look at -- this is Government's Exhibit 3, and I

13  want to first ask you what we're looking at here.  This is

14  just a portion.

15         What is this?

16  A.  This is after the rental vehicle Mr. Howell was operating

17  was stopped by Officer Byrd.  We're seeing the open rear

18  passenger --

19  Q.  No, no.  We're not there yet.

20  A.  Oh, I'm sorry.  I went to 4.

21         Sorry, Your Honor.

22  Q.  This is Exhibit 3.  It's a one-page document, and it may

23  be on your monitor as well.  Do you see something on your

24  monitor?

25  A.  Yes, sir.

──────────────── A. Beha - Direct ────────────────

1   Q.   Okay.  This is II-4.  What is this taken from?

2   A.   This is taken from the NCIC and VCIN policy manual.

3   Q.   How lengthy is this policy?

4   A.   It's over 1,000 pages.

5   Q.   I want you to look at this last paragraph here, this

6   first sentence.

7        "Correct NCIC/VCIN procedure requires the agency

8   which placed the record in the file be contacted by the

9   inquiring agency to confirm that the data is accurate and

10  up-to-date."

11       Is that what you were just explaining to the Judge?

12  A.   Yes, Your Honor.

13  Q.   Is that policy, this VCIN -- NCIC/VCIN policy, is this

14  consistent with the Chesapeake policy that we just looked at

15  in Government's Exhibit 2?

16  A.   Yes, sir.

17       THE COURT:  Let me ask you a question, Mr. Butler.

18  Has this been adopted by the Commonwealth of Virginia?

19       MR. BUTLER:  That was my next question, is how --

20       THE COURT:  This is a legal question.  Has it been

21  adopted as a regulation by the Commonwealth of Virginia?

22       MR. BUTLER:  It would be difficult for me to answer

23  that because this is such a -- I mean this is a 1,000-page

24  Policy & Procedures.  I don't know for every --

25       THE COURT:  Look at the Register of Regulations for

—————————A. Beha - Direct—————————

1    the Commonwealth, and it would tell you that.

2              MR. BUTLER:  We can look into that, Your Honor.

3              THE COURT:  But we're here for the hearing today.

4    If you don't know, that's okay.

5              MR. BUTLER:  Standing here today, Your Honor, I

6    don't know the answer to that, but I do want to ask, and this

7    could clear it up:

8    BY MR. BUTLER:

9    Q.  How does this VCIN/NCIC policy inform Chesapeake's

10   policy?

11   A.  My understanding is Chesapeake's policy interprets VCIN

12   and NCIC policy, and the way it is deployed is how they want

13   their officers and detectives to follow the thousand pages

14   down to one page of what they expect of their officers, how

15   they expect them to move forward on a possible wanted

16   subject.

17   Q.  All right.  So now, shifting gears back to the morning of

18   September 27th, what happened just prior to noon at the Aloft

19   Hotel?

20   A.  Myself and the investigative team were on surveillance in

21   the parking lot area.  I observed a black Cadillac SUV

22   bearing Georgia license plates pull up to what I would

23   describe as the front, just short of the awning of the front

24   entrance.

25              I observed an African-American male, which I

A. Beha - Direct

1    immediately recognized to be Mr. Howell because I was very

2    familiar with him, exit the driver's seat, and he proceeded

3    inside the main entrance to the hotel.  He was inside for

4    approximately ten minutes, maybe a little less.

5           While inside, I observed an African-American female

6    exit the front passenger's seat and just kind of seemed to be

7    standing near the passenger's side of the car.  Mr. Howell

8    exited, placed a dark-colored Puma -- what I would describe

9    as a duffel bag in the rear driver's seat, and they proceeded

10   to enter the vehicle -- Mr. Howell again was driving -- and

11   depart the parking lot.

12   Q.  So what did you and your law enforcement team do as soon

13   as you saw him pull away?

14   A.  We followed him.

15   Q.  What did you observe as he's driving away?

16   A.  I observed that he was driving in an extremely cautious

17   manner, and what I mean by that is, obviously, we want

18   everyone to follow the traffic laws, but Mr. Howell was

19   consistently driving five to ten miles below the speed limit.

20   He was consistently using his turn signal, again which is a

21   good thing, but it seemed overly cautious.

22          At one point, when Mr. Howell was making a right

23   onto Volvo Parkway, he had his right-turn signal on,

24   activated for at least a hundred feet approaching that

25   intersection.  It appeared that he was attempting to be

Carol L. Naughton, Official Court Reporter

A. Beha - Direct

1    overly cautious not to be recognized by anyone.

2    Q.  And to be clear here, you didn't see him breaking any

3    laws while driving, correct?

4    A.  No.

5    Q.  But you ultimately made the call to have the vehicle

6    pulled over, right?

7    A.  I did.

8    Q.  And explain to the Judge your rationale.  What was going

9    through your mind that morning on making that call to pull

10   that vehicle over?

11   A.  Sure.  Again, on its own, this cautious driving, as I'm

12   describing it, really, it doesn't mean a lot to me, but the

13   totality of the circumstances are what, in my head, made me

14   reason to believe that a crime was being committed or was

15   going to be.

16            And I base that on:  my original knowledge of

17   Mr. Howell five years ago, when I knew he was involved with

18   the ownership or running of a business that was being

19   utilized to sell controlled substances; that that

20   investigation resulted in a federal plea concerning the

21   distribution of controlled substances; two informants during

22   that time period identifying Mr. Howell and the business as

23   being involved in that distribution; my knowledge that he had

24   a previous trafficking narcotics in the state of Virginia --

25            THE COURT:  He had what?

A. Beha - Direct

1          THE WITNESS:  He had a previous arrest for his
2     involvement in trafficking.
3          THE COURT:  Did that result in a conviction?
4          THE WITNESS:  I believe -- there were multiple
5     charges.  I believe there was a conviction for a drug
6     offense, but I don't believe it was for that charge.  I
7     believe it was a plea agreement of some sort, Your Honor.
8          THE COURT:  Okay.
9          THE WITNESS:  (Continuing) -- that on this date, an
10    informant that I know to be reliable had specific information
11    about this hotel and not only about an individual the
12    investigative team was focused on, but about information
13    about multiple local distributors meeting there to exchange
14    product;
15          That Mr. Howell was operating a -- I knew he didn't
16    live here.  I had been monitoring him for several years.
17    Social media -- I knew he moved out of state; that he was at
18    this hotel, where reportedly drug transactions were
19    occurring, for one night, again in a rental vehicle, a black
20    rental vehicle with out-of-state tags, which was mentioned by
21    the CI, though it was related to another individual;
22          He was accompanied by an unknown African-American
23    female, which was specifically mentioned by the CI; that he
24    only stayed in the area for one night, or he was on the
25    registration for one night; that he walked in a hotel for

A. Beha - Direct

1    less than ten minutes and exited with a bookbag.

2           All of that, in addition to the cautious driving, is

3    why I thought it was reasonable that something else was

4    occurring here, as well as, obviously, the suspected

5    outstanding arrest warrant.

6           THE COURT:  As well as what?

7           THE WITNESS:  The suspected outstanding arrest

8    warrant.

9           THE COURT:  All right.

10   BY MR. BUTLER:

11   Q.  And you call it suspected because you weren't able to

12   verify it prior to the stop, per your policies?

13   A.  I would call it an arrest warrant, but at this point --

14   with the argument against extradition.  That's why I used the

15   word "suspected."

16          THE COURT:  Say that again.

17          THE WITNESS:  Because I'm aware of all of the

18   argument against the word "extradition" and things like that.

19   At the time, it was an arrest warrant, per my policy which

20   guides me.

21          THE COURT:  Let me see if I've got this straight,

22   because it seems like we're getting down to the nub of this.

23          You thought there was a warrant based on what you

24   had looked up in VCIN either earlier that morning or the

25   night before; is that right?

A. Beha - Direct

1          THE WITNESS:  Approximately two hours before the

2    stop.

3          THE COURT:  So you looked, and it said there was a

4    warrant in Georgia somewhere for him?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.  And that's what motivated you to

7    stop him, along with all these other suspicions that you had?

8          THE WITNESS:  Yes, sir, the totality of them.

9          THE COURT:  You told a traffic officer to stop him?

10          THE WITNESS:  Yes.  Requested, yes, sir.

11          THE COURT:  All right.

12    BY MR. BUTLER:

13    Q.  And just to follow up on that -- and I'm showing you

14    Government's Exhibit 1 again -- the warrant that you saw that

15    morning, was there anything in this language that led you to

16    doubt that there was an active arrest warrant?

17    A.  No, sir.

18    Q.  So were you part of the traffic stop?  Were you there at

19    the scene?

20    A.  Not initially.  I was nearby observing.  But until

21    Detective Rombs advised me that suspected controlled

22    substances had been located, that's when I responded up to

23    the vehicle.

24    Q.  And what was your role once you responded?

25    A.  I took photographs, and I collected any evidence that we

———————A. Beha - Direct———————

1   deemed significant.

2   Q.  Take a look at Government's Exhibit 4.  It's a three-page

3   document.  This is -- it's filed Document 75-4.  And tell the

4   Judge, who took these photographs?

5   A.  I did.

6   Q.  And what is depicted on this first page?

7   A.  This is the open rear driver's side door of the SUV

8   Mr. Howell was operating.

9   Q.  And what about -- what is the significance of the Puma

10  bag, the duffel bag that's back there?

11  A.  That's the Puma bag I observed Mr. Howell exit the hotel

12  with and place in that location.

13  Q.  What is the significance of the U.S. Postal box?

14  A.  I actually placed that there for the photograph.  That's

15  where it was originally located by Detective Rombs, but I

16  wanted everyone here involved to know where it was originally

17  located.  The items which you'll see in the next two photos

18  were actually located in that box, which are four

19  vacuum-sealed bags.

20  Q.  So to be clear, this postal box was closed at the time

21  you originally saw it?

22  A.  Yes.

23  Q.  And then you eventually opened it, and looking at Page 2,

24  what are we seeing here?

25  A.  You're seeing the contents of that box.

—————A. Beha - Cross—————

1  Q.  So these soft U.S. Postal envelopes were within the box?

2  A.  Yes, sir.

3  Q.  And then Page 3, what are we looking at right here?

4  A.  Those are four individually packaged vacuum-sealed bags,

5  each containing suspected methamphetamine.

6  Q.  Approximately what was the quantity of methamphetamine

7  recovered?

8  A.  Just under 2 kilograms.

9        MR. BUTLER:  Your Honor, those are all the questions

10  I have on direct.

11        THE COURT:  All right.  Cross-examination,

12  Mr. Broccoletti?

13        MR. BROCCOLETTI:  Yes, sir.

14                   CROSS-EXAMINATION

15  BY MR. BROCCOLETTI:

16  Q.  Good morning.  How are you?

17  A.  Good morning, sir.

18  Q.  Let's go back to the beginning, if we could, please.

19        You talked initially about the information that you

20  had received about Mr. Howell which led you to have some

21  suspicions, if you will.

22        First of all, just to be clear about the times, with

23  respect to the building that was subject to a controlled

24  purchase that was located in Portsmouth which led to a

25  federal indictment, do you remember talking about that?

Carol L. Naughton, Official Court Reporter

———————A. Beha - Cross———————

1    A.   Yes, sir.

2    Q.   That was November of 2014, was it not?

3    A.   Sounds accurate, yes, sir.

4    Q.   That's approximately five years prior to the time the

5    stop of this vehicle occurred?

6    A.   Yes, sir.

7    Q.   And during that time, Mr. Howell -- no controlled buys

8    were made from him?

9    A.   No.

10   Q.   And no arrest warrants were issued for him?

11   A.   Not from Virginia.

12   Q.   Right, for Mr. Howell.

13   A.   Yes, sir.

14   Q.   And at that point, you had spoken, I believe, to other --

15   I believe you called them cooperating witnesses or

16   confidential informants, correct?

17   A.   Yes, sir.

18   Q.   And again, we're talking about approximately five years

19   prior to the time of the date of the stop?

20   A.   They would have -- those interviews would have been

21   following the controlled purchases within the next year or

22   two.

23   Q.   And then I think you said within the next year or two,

24   you continued to investigate certain drug trafficking

25   organizations, and in speaking with those individuals, your

A. Beha - Cross

1    notes indicate the investigative team continued to hear
2    Mr. Howell's name being involved in trafficking of controlled
3    substances.   Is that an accurate word, "hear"?
4    A.   Yes.   Listened during interviews.
5    Q.   No controlled buys were made from him?
6    A.   No, sir.
7    Q.   No arrests were made of him?
8    A.   No, sir.
9    Q.   So then we fast-forward to 2019.   You said that you had
10   continued to become aware of Mr. Howell and his activities
11   and things of that nature through Facebook, social media, and
12   things of that nature?
13   A.   Yes.
14   Q.   Any arrests concerning Mr. Howell with narcotics
15   offenses?
16   A.   No.
17   Q.   The arrests that you had spoken to the Court about
18   earlier actually emanated from Virginia Beach.   Do you
19   remember that?
20   A.   Yes.
21   Q.   And I believe the date of that was sometime in 2008?
22   A.   I believe you're correct.
23   Q.   And he was not convicted of any transportation or
24   trafficking offenses; he was convicted of a possession with
25   intent to distribute?

A. Beha - Cross

1   A.   Yes.

2   Q.   So those are the facts that you knew prior to September

3   of '19, right?

4   A.   Yes.

5   Q.   All right.   In September of '19, you've described to the

6   Court a confidential informant that you had who was rather

7   specific in the information that that person was able to give

8   to you, right?

9   A.   Correct.

10  Q.   The information that the confidential informant provided

11  to you, which you considered to be reliable, named a specific

12  person, right?

13  A.   Yes.

14  Q.   That specific person was going to be at that specific

15  hotel, right?

16  A.   That is correct.

17  Q.   And that specific person was going to be driving a black

18  rental vehicle, correct?

19  A.   Yes.

20  Q.   And that specific person was going to be in the

21  accompaniment of an African-American women, right?

22  A.   They weren't as sure about that one, but yes.

23  Q.   I think an unknown woman?

24  A.   Suspected, yes.

25  Q.   You knew that to be associated with that person that you

A. Beha - Cross

1    had that name for, right?

2    A.   That is correct.

3    Q.   So then you -- that particular night of the 26th, do you

4    go to the hotel?

5    A.   No.  Early the following morning.

6    Q.   At, like, 7:00 or so in the morning?

7    A.   Yes, sir.

8    Q.   At that point do you see any traffic or activity within

9    this pool table, bar room, whatever the circumstances may

10   have been, common area?

11   A.   No, sir.  I'm not sure it was open at that point.

12   Q.   You don't see Mr. Howell at that point?

13   A.   No.

14   Q.   You don't see the individual specifically that you're

15   looking for?

16   A.   No.  And nor did we see any vehicles matching the

17   description.

18   Q.   You talked about an out-of-state rental.  Did the

19   informant give you a specific state for which it was coming

20   from?

21   A.   Not specific, but it was suspected that it was from a

22   northern state.

23   Q.   And Georgia is obviously in the South?

24   A.   Yes, sir.

25   Q.   With respect to your review of the registry, at that

—————————————A. Beha - Cross—————————————

1   point, your partner, I think it is, gets ahold of the
2   registry --
3   A.  Yes.
4   Q.  -- can't find the individual on it, but finds two people
5   that you do know, one of whom is Mr. Howell, correct?
6   A.  Correct.
7   Q.  You know Mr. Howell has family in the area?
8   A.  Yes.
9   Q.  You know Mr. Howell is originally from the Tidewater
10  area?
11  A.  I believe he's originally from New Jersey.
12  Q.  My fault.  I apologize.
13          But he has connections to Tidewater?
14  A.  Yes.
15  Q.  And has lived here for a -- did live here for a number of
16  years?
17  A.  Yes, sir.
18  Q.  During your review of Mr. Howell's social media, had you
19  seen that he had been visiting the Tidewater area -- I don't
20  know if I want to say frequently, but had been here on a
21  number of occasions before '19?
22  A.  Infrequently, I would say.  I had seen that -- it
23  appeared he had been back local several times.  Most of the
24  things I observed was him traveling throughout the
25  United States.

———A. Beha - Cross———

1   Q.  You learned that he was involved in music --

2   A.  Yes.

3   Q.  -- and was a promoter --

4   A.  Yes.

5   Q.  -- and had some people, that I don't know of and that I

6   don't listen to, that he was working with, right?

7   A.  Yes, sir.

8   Q.  So when you see his name on the registry, you make some

9   determinations that you're going to inquire further about him

10  while he's here, et cetera?

11  A.  Not just him.

12  Q.  But the other individual too?

13  A.  And other individuals, as well, on the registry.

14  Q.  So the first thing you do is to run a VCIN?

15  A.  Yes.

16  Q.  Why do you run a VCIN first?

17  A.  Because I don't have -- I can't say it's the first thing.

18  I'm sure I used other databases as well.  I'm not sure which

19  order, as in we have a LInX database and things

20  that confirm --

21          THE COURT:  So why did you run the VCIN?  Just

22  answer the question, please.

23          THE WITNESS:  I wanted to see if Mr. Howell, since I

24  had last looked that closely at him, had received any

25  previous charges, had any arrest warrants, anything like

A. Beha - Cross

 1   that, I guess would be the appropriate answer.
 2   BY MR. BROCCOLETTI:
 3   Q.  When would the last time you would have looked at him
 4   been?
 5   A.  Within the past year.
 6   Q.  Did you check VCIN within the past year?
 7   A.  I'm sure I did, yes.
 8   Q.  Did you notice the outstanding warrant from Georgia
 9   within the past year?
10   A.  No, I did not.
11   Q.  The warrant is dated, I believe, according to the record,
12   it looks like May 21st of 2018.  Does that sound accurate?
13   A.  I believe that is accurate.
14   Q.  And so what -- would you recall having looked at VCIN
15   since May 21st of 2018 with respect to Mr. Howell?
16   A.  I can't say for sure.  Either -- I obviously would have
17   had to look at it prior to the issuance of the warrant, or at
18   the time I didn't notice it because I didn't have direct
19   contact with him or...
20   Q.  Did any of the other databases that you looked at contain
21   this information coming out of Crawfordville, Georgia?
22   A.  No.
23   Q.  Did that cause you any concern --
24   A.  No.
25   Q.  -- that the warrant that was listed on the VCIN wasn't

———————————A. Beha - Cross———————————

1    confirmed through any of the other databases that you looked

2    at?

3    A.  I did not have any concern over that.

4         THE COURT:  Well, did the other databases that you

5    checked have warrants and things in them?

6         THE WITNESS:  Every once in a while, the LInX

7    database will show there's a possible, but the problem with

8    that is --

9         THE COURT:  I don't know what that is.  Let's

10   pretend like I'm not a police officer.

11        THE WITNESS:  It's one that will have a photograph

12   and different offenses and give a description a little more

13   than what that says.  The problem with it is is it's not

14   mandated that agencies take part.  So they may not have

15   entered something, which I'm guessing that this jurisdiction

16   in Georgia didn't because it didn't say anything about this.

17        THE COURT:  Do the other databases have warrants in

18   them?

19        THE WITNESS:  They do not.  The other one -- it's

20   called TLO, Your Honor.  It's more to confirm residency.

21        THE COURT:  Okay.  Thank you.

22   BY MR. BROCCOLETTI:

23   Q.  The government asked you about -- I believe it's

24   Exhibit 2, the Mobile Data System.  Do you have that?

25   A.  Yes, sir.

A. Beha - Cross

1  Q.  And I believe you said that this was the policy that you
2  were operating under at the time?
3  A.  Yes, sir.
4  Q.  And that this was the policy that, in your opinion, would
5  have prevented you from contacting Crawfordville, Georgia?
6  A.  Correct.
7  Q.  In the government's brief on Page 3, the government says
8  that you did not have access to the Mobile Data System, that
9  only the officer in the car had access.  Is that accurate?
10  A.  It is accurate.
11  Q.  So, then, how does this policy apply to you if you don't
12  even have the laptop and it applies just to the officer in
13  the car?
14  A.  I believe it actually says --
15  Q.  Because you don't have access to the system.
16  A.  I believe it actually says on the letter I, or India,
17  sir.
18  Q.  I'm sorry?
19  A.  I believe it actually states something about what you're
20  asking on.
21  Q.  Where are you?
22  A.  On the letter I, or India, Page 2.
23       THE COURT:  Hold on.  "I."  Okay.  Go ahead.
24  BY MR. BROCCOLETTI:
25  Q.  What language are you referring to?

—————————————A. Beha - Cross—————————————

1    A.   "The only exceptions to this are when an officer/

2    detective is not currently assigned a laptop, having laptop

3    malfunctions, or is not in close proximity to his or her

4    laptop."

5             THE COURT:  Where are you reading?  This is the

6    first paragraph of I?

7             THE WITNESS:  Yes, sir.

8             THE COURT:  It says "License and warrant checks

9    shall be conducted via MDS."

10            MDS is what?

11            THE WITNESS:  That is what I described --

12            THE COURT:  Mobile Data System?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  And that's a Chesapeake thing?

15            THE WITNESS:  That is the access that officers have

16   access on the laptop.

17            THE COURT:  All right.

18   BY MR. BROCCOLETTI:

19   Q.   So did you have a laptop?

20   A.   No, sir.

21   Q.   You were in your office?

22   A.   No.

23   Q.   Where were you?

24   A.   I was in my -- I'm sorry.  I thought you were asking do I

25   have a laptop in my office.

Carol L. Naughton, Official Court Reporter

A. Beha - Cross

1          I do not.  I was in my office at the Chesapeake

2    Narcotics office at my desk, but unfortunately, detectives

3    only have access to what is called LERMS, which only provides

4    this criminal history that you're viewing, Your Honor.

5          What officers see on the street in the Mobile system

6    and what detectives see are different.  The officer can't see

7    what detectives see, and the opposite is true as well.

8    Q.  So at some point in time prior to the stop of Mr. Howell

9    by the uniformed officer, you had been in contact with the

10   uniformed officer?

11   A.  Via radio, off and on, yes.

12   Q.  Via radio.  And do you remember the first time that you

13   would have contacted the uniformed officer?

14   A.  Shortly after -- somewhere after 10:00.

15   Q.  And is the purpose to begin to set up --

16   A.  Yes.

17   Q.  -- to stage it, to get everybody in place, so to speak?

18   A.  Yeah.  I mean, we hadn't -- we didn't even have a way to

19   verify if Mr. Howell was still there, but just in case he or

20   any other of the subjects that possibly could be involved,

21   yes.

22   Q.  How many times would you say that you communicated -- I'm

23   sorry.  The officer's name was?

24   A.  Byrd, B-y-r-d.

25   Q.  Byrd.  I apologize.  Thank you.

─────────────────────────A. Beha - Cross─────────────

1          How many times would you say that you had

2    communicated with Officer Byrd between that first time and

3    the time that the actual stop occurred?

4    A.   Five, probably.

5    Q.   And you knew that Officer Byrd obviously was a uniformed

6    officer?

7    A.   Yes.

8    Q.   You knew he had a laptop?

9    A.   Correct.

10   Q.   You knew he had the Mobile Data System?

11   A.   Yes.

12   Q.   Did you ask him to use the Mobile Data System to confirm

13   anything about this warrant?

14   A.   No.

15          THE COURT:  Why not?

16          THE WITNESS:  Because I knew that our policy -- even

17   if we did that, our dispatcher would not attempt to verify it

18   with Georgia because the person was not in our presence or

19   custody.  At that point, we didn't even know if he was still

20   in Virginia.

21   BY MR. BROCCOLETTI:

22   Q.   Mr. Howell?

23   A.   Yes.

24   Q.   When did Mr. Howell show up at the hotel?

25   A.   Approximately two hours after I originally saw that

─────────────────A. Beha - Cross─────────────

 1   wanted alert.

 2          THE COURT:  It doesn't say "custody," does it?  It

 3   doesn't say just "custody"?

 4          THE WITNESS:  Correct.  I believe it says

 5   "custody" --

 6          THE COURT:  Someone with whom they are in contact.

 7          THE WITNESS:  In the presence or contact of, yes,

 8   sir.

 9          THE COURT:  So you think you were in contact with

10   Mr. -- what does "in contact" mean?  So following him around,

11   you think, might be in contact?

12          THE WITNESS:  No, sir.  I know it isn't because I've

13   had incidents where I've been following someone that will

14   come up on your Mobile system, when I was a uniformed

15   officer, that says "possibly wanted."  The dispatcher won't

16   run it until that person cannot leave.

17   BY MR. BROCCOLETTI:

18   Q.  And I think your explanation as given to the government

19   earlier was that the reason not to engage in that is because

20   of the waste of resources, I think were the words that you

21   used?

22   A.  I believe that's one of them, yes.

23   Q.  So would you consider a telephone call a greater waste of

24   resource than assembling a team of uniformed police officers

25   to stop a car?

A. Beha - Cross

```
 1  A.  A telephone call from whom, sir?
 2  Q.  A telephone call from you or from an officer, is that a
 3  greater waste of resources in assembling a -- staging a team
 4  to stop a car?
 5  A.  Waste of resources -- it's probably less to place a phone
 6  call, but the policy does not allow it.
 7  Q.  As well as a waste of resources stopping a citizen and
 8  subjecting them to intrusion by a police officer?
 9  A.  I don't believe it's intrusion if they have a document
10  that says they're possibly wanted.
11  Q.  So just tell me --
12          THE COURT:  Wait a minute.  You don't think it's an
13  intrusion to have police stop you?
14          THE WITNESS:  Not if you have -- are in a
15  database --
16          THE COURT:  You may have justification, but it's
17  certainly an intrusion.
18          THE WITNESS:  Yes, Your Honor.  I can't disagree
19  with that.
20          THE COURT:  It's never a good idea to play word
21  games with a lawyer.
22          THE WITNESS:  Yes, sir.
23  BY MR. BROCCOLETTI:
24  Q.  So just tell me specifically each and every step you
25  took, once at 9- -- about 9:55 in the morning when you got
```

A. Beha - Cross

1   the VCIN and the hit?

2   A.   9:59, yes, sir.

3   Q.   Tell me specifically every step you took, if any, to

4   confirm that warrant as what the VCIN says you should do.

5   A.   None --

6   Q.   I'm sorry?

7   A.   None, until I could follow the policy, that the subject

8   was in contact with a law enforcement officer.

9   Q.   And on Government's Exhibit 3, with respect to the NCIC

10  and the VCIN data, is this something that you also have been

11  trained on when you went to the academy?

12  A.   Not that in depth.  I actually found this doing research

13  after receiving the defense's paper regarding court today.

14          THE COURT:  So I guess, then, you didn't rely on

15  that in making any decisions out in the field.

16          THE WITNESS:  I relied that our department policy

17  would guide the officers of the VCIN policy, yes, sir.

18          THE COURT:  But you didn't know about this, so you

19  didn't rely on it.

20          THE WITNESS:  Not that in depth, definitely not.

21          THE COURT:  You relied on what was in your policy

22  manual.

23          THE WITNESS:  Yes, sir.

24  BY MR. BROCCOLETTI:

25  Q.   Is the NCIC/VCIN data manual part of your Chesapeake

A. Beha - Cross

1   policy and procedure?

2   A.   No.

3   Q.   Even though that's what you use to be able to determine

4   the existence of a criminal record?

5   A.   The policy from the Mobile Data System guides officers on

6   how to apply NCIC and VCIN.

7   Q.   Right.  I understand that.  But my question was -- this

8   is obviously -- what we're looking at in Government's

9   Exhibit 1, that's obviously VCIN/NCIC?

10  A.   Yes.

11  Q.   And that's what you're using?

12  A.   It is.

13  Q.   So you're not familiar as to whether or not the policy

14  that NCIC/VCIN itself produces for the use of their

15  information is incorporated into the Chesapeake policy?

16  A.   I believe the --

17          THE COURT:  I think he's answered that.  He said

18  that the policy manual is something they create for the

19  police officers to use so they don't have to carry around a

20  1,000-page manual.

21          MR. BROCCOLETTI:  Yes, sir.  Moving on, then, Your

22  Honor.

23  BY MR. BROCCOLETTI:

24  Q.   With respect to the specifics that you had talked about

25  when the government asked you about the reasons that you had

A. Beha - Cross

1    or the knowledge that you had prior to the stop of the
2    defendant, we've already talked about the 2014 and 2017
3    circumstances and the information, the 2008 arrest in
4    Virginia Beach, and then you also continued to talk about the
5    rental car that the defendant was driving.
6             How did you know that he was driving a rental car?
7    A.   Rental cars have a little sticker that, from training and
8    experience, we know shows it's a rental car.  That was the
9    initial.  After all of this, we completed a VCIN inquiry and
10   confirmed that it was -- I can't remember which rental car
11   company, but confirmed it was a rental car.
12   Q.   So you didn't know that before the stop?
13   A.   I knew --
14   Q.   You knew it because of the sticker?
15   A.   Yes.
16   Q.   But you didn't actually take the license plate and run
17   the plate?
18   A.   I did not, no.
19   Q.   Did the officer, Officer Byrd?
20   A.   Not that I'm aware of.
21   Q.   You mentioned to the Court that the presence of the
22   rental car, the presence of the female, as information having
23   been given to you by the informant, but we've already
24   determined that the informant gave you a specific name
25   associated with that car and with that female, and that name

A. Beha - Cross

1    was not the defendant's, correct?

2    A.   Correct.

3    Q.   So, really, the rental car and the female in the car have

4    nothing to do with anything, do they?

5    A.   I would disagree based on my status of mind at the time.

6    Q.   Did you know the defendant, since you followed him for

7    the past several years, had a sister?

8    A.   I was aware he had two sisters.  But I had never seen

9    her.

10   Q.   You also mentioned the fact that the defendant had

11   entered into the hotel, had stayed for, I believe you said,

12   ten minutes or so?

13   A.   Approximately ten minutes.

14   Q.   And then had left with a duffle bag, or something to that

15   effect?

16   A.   Yes, sir.

17   Q.   You were aware at the time that the defendant had been a

18   registered guest at the hotel?

19   A.   Yes.

20   Q.   And was it conceivable to you that the defendant was

21   checking out of the hotel with his goods?

22   A.   It was at that point, yes.

23   Q.   And, obviously, innocent travelers stay at the Aloft

24   Hotel in Chesapeake that are not involved in drug activities?

25   A.   Hopefully the majority.

──────A. Beha - Redirect──────

1   Q.  How many rooms are there, do you know?

2   A.  I believe -- I don't know the rooms.  There's either four

3   or five floors.

4           MR. BROCCOLETTI:  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           So are Aloft Hotels everywhere known for this, or is

7   this just Chesapeake?

8           THE WITNESS:  I can only talk about the local one,

9   Your Honor.

10          MR. BUTLER:  Just three follow-up questions, Your

11  Honor.

12          THE COURT:  All right.  Three.

13                    REDIRECT EXAMINATION

14  BY MR. BUTLER:

15  Q.  The first is:  Can you just clarify, again, the

16  difference between your desk computer and the Mobile Data

17  System?

18  A.  Sure.  They simply have access to do two different

19  platforms.  A detective who does not have a laptop has access

20  to something more that -- more similar to what a dispatcher

21  would see, of where -- who to contact, things like that.  The

22  opposite -- they do not have access to what the Mobile

23  computer is seeing, which will mention possible extradition

24  and --

25  Q.  And that's what is in the patrol car?

─────────────────────────A. Beha - Redirect─────────────────────────

1   A.   Yes.

2   Q.   That fine.

3           The second question is:  We talked about VCIN, LInX,

4   TLO.  Of those data systems that you looked into that morning

5   on the defendant, which one of those is a jurisdiction

6   required to enter an arrest warrant?

7   A.   VCIN and NCIC, which are one and the same.

8   Q.   And then the last question is:  There was a lot of

9   argument about how easy it would be to just make a phone call

10  to check the status of this warrant.

11          Why didn't you just do that?

12  A.   Well, for one, it doesn't follow Chesapeake policy in two

13  rights.

14          THE COURT:  Well, it doesn't follow the policy with

15  respect to the computers and the laptop.  That doesn't seem

16  to apply to your computer.

17          THE WITNESS:  And, also, Your Honor, the second part

18  of the policy states that that inquiry has to come from an

19  ECC personnel.

20          THE COURT:  That deals with the MDS, not with your

21  computer, right?

22  BY MR. BUTLER:

23  Q.   You need to clarify that.

24          So are you allowed to check the status -- per your

25  policy, can you check the status of a warrant by calling

———————————A. Beha - Redirect———————————

1    another jurisdiction?  Can you do that?

2    A.   No.

3    Q.   Why not?  What is the policy?

4    A.   May I refresh on the policy?

5    Q.   Yes.  Look at Page 2, Government's Exhibit 2.

6         THE COURT:  Well, Page 2 refers to the Mobile Data

7    System, which is a different system than he's got.

8         MR. BUTLER:  Right.

9         THE COURT:  So it doesn't apply to what he's got in

10   his office.

11   BY MR. BUTLER:

12   Q.   Why don't you, then, answer the Judge's question.  Absent

13   Government's Exhibit 2 -- just put that aside for a second --

14   based on your training and your experience, ten years in the

15   Chesapeake Police Department, what are you allowed -- what

16   are you authorized to do when you see somebody has an active

17   arrest warrant in another jurisdiction?

18   A.   First step is they need to be detained, then I request or

19   notify of a possible warrant to the ECC personnel, and the

20   ECC personnel have the technology in place to confirm or deny

21   said warrant with the jurisdiction that issued it.

22        THE COURT:  And that's because, as you said, it's

23   all done by computers and not phone calls?

24        THE WITNESS:  Yes, sir.  And that allows the system

25   to be up-to-date.  For example, if a warrant is confirmed,

K. Byrd - Direct

1    that agency can remove it; whereas, I'm not sure if a

2    detective called six states away and said, "Hey, sir, can you

3    tell me about this warrant," how are they going to confirm

4    I'm a law enforcement officer?  That system allows a

5    foolproof way for them to monitor it.

6            MR. BUTLER:  No further questions.  Thank you.

7            THE COURT:  Any further questions for this witness?

8            MR. BROCCOLETTI:  No, Your Honor.  Thank you.

9            THE COURT:  May he be excused?

10           MR. BUTLER:  Yes, Your Honor.

11           (The witness was excused.)

12           MR. BUTLER:  At this time, we're going to call

13   Officer Byrd.

14           THE COURT:  Before Officer Byrd comes in, I'm

15   supposed to be on a conference call with Chief Judge Davis at

16   1:00, and I think I need to tell him that I'm down here.

17           MR. BUTLER:  These next two witnesses, Your Honor,

18   will be relatively brief.

19           THE COURT:  Well, but then we have to hear from you

20   and Mr. Broccoletti, which may not be so brief.

21           (There was a pause in the proceedings.)

22           (The witness was affirmed.)

23           KENNETH BYRD, called by the Government, having been

24   first duly affirmed, was examined and testified as follows:

25                    DIRECT EXAMINATION

——————K. Byrd - Direct——————

1   BY MR. BUTLER:

2   Q.  Please state your name.

3   A.  I'm Officer Kenneth Byrd with the Chesapeake Police

4   Department.

5   Q.  Spell your last name.

6   A.  Byrd, B-y-r-d.

7   Q.  How long have you been with the Chesapeake Police

8   Department?

9   A.  Approximately seven-and-a-half years.

10  Q.  Which division are you assigned to?

11  A.  Currently assigned to the traffic enforcement section.

12  Q.  And traffic enforcement, how many years have you been

13  doing that?

14  A.  About a year and a half.  January of last year, I was

15  transferred.

16  Q.  And prior to that, what were you doing?

17  A.  I was assigned to Operations.

18  Q.  In the time that you have been with the Chesapeake Police

19  Department approximately how many traffic stops have you been

20  involved with?

21  A.  Hundreds.  I couldn't count.  Hundreds.

22  Q.  Let's talk about September 27th, 2019.

23          Were you on duty that day?

24  A.  I was.

25  Q.  And around noon, were you involved in a traffic stop

55

—————————————————————————————— K. Byrd - Direct ——————————————————————————————

1   involving this defendant?

2   A.   Yes.

3   Q.   Please tell the Court what information you had about the

4   vehicle and its occupants prior to initiating your stop.

5   A.   I was contacted prior to noon and advised that there was

6   a black SUV with an out-of-state tag that was being operated

7   by Xavier Howell who had a warrant from the state of Georgia

8   out for his arrest and that the detectives that contacted had

9   been also investigating this subject as part of a narcotics

10  investigation.

11  Q.   How long did you observe the vehicle prior to initiating

12  your stop?

13  A.   Just a couple of moments.   Maybe two moments.

14  Q.   Two minutes?

15  A.   Minutes, I'm sorry, yes.

16  Q.   What time did you initiate the stop?

17  A.   12:06 p.m.

18  Q.   How can you be so specific that it's 12:06?

19  A.   Dual authentication.   One, I called the traffic stop in

20  to dispatch, and the dispatcher generates an assignment for

21  me to be assigned to through our computer dispatch system.

22  That was done at 12:06.   The second is via body camera, and

23  when the body camera is activated, it turns on timestamps and

24  backs up 30 seconds of silence.

25  Q.   Why don't you tell us about the initial encounter that

———————————————K. Byrd - Direct———————————————

1   you had with the defendant.

2   A.  I approached the vehicle on -- this is on Tintern Street

3   in Chesapeake.  I approached the vehicle, which was a black

4   Escalade, Cadillac Escalade, on the driver's side.

5   Mr. Howell was the driver of the vehicle.  I advised him that

6   I was conducting the stop because the license plates did not

7   return to that vehicle and asked him for his license and

8   registration.

9   Q.  Was that -- the fact that the license plate didn't return

10  to that vehicle, was that just a ruse?

11  A.  Yes.

12          THE COURT:  You advised who that the license plate

13  did not return to the vehicle?

14          THE WITNESS:  Mr. Howell, the driver, sir.

15          THE COURT:  Why did you tell him that?

16          THE WITNESS:  Just as a ruse, because I knew he had

17  a warrant.  In my experience, by telling somebody directly

18  I've stopped them for having a warrant, it may result in

19  fleeing, and to prevent that, I just decided to make

20  something up.  That way I could get his information and run

21  it to determine if the warrant was still in the system.

22  BY MR. BUTLER:

23  Q.  So when you ran the defendant's information in your

24  Mobile Data System, what did you learn?

25  A.  It did return that there was an active warrant from

K. Byrd - Direct

```
 1    Georgia.  As I was reading through the hit in our system, it
 2    showed that it was non-extraditable from the state of
 3    Georgia.
 4              THE COURT:  Say that again.  You did what?  You
 5    ran --
 6              THE WITNESS:  Yes, sir.  Once I retrieved his
 7    information, I went back to the vehicle, my vehicle, and ran
 8    the license number through the VCIN/NCIC system and --
 9              THE COURT:  You mean his driver's license?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  Okay.
12              THE WITNESS:  And then it returned with a hit for an
13    active warrant.
14              THE COURT:  Okay.  And what did you say about it
15    being extraditable?
16              THE WITNESS:  The warrant indicated from Georgia
17    that it was a non-extraditable warrant.
18    BY MR. BUTLER:
19    Q.  So why -- if it's non-extraditable, what do you do?  What
20    does your training and experience and policy dictate you to
21    do when you see at this point it's non-extraditable?
22    A.  Regardless of what the computer says, we're still
23    required to confirm it via dispatch, just because things may
24    change.  So we have to still go to a dispatcher on the radio
25    and confirm with them the warrant's existence.
```

--------K. Byrd - Direct--------

1   Q.  Why?  What do you mean that things could change?  It says
2   non-extraditable.
3   A.  The locality that the warrant was issued in could have
4   maybe changed it to extraditable, or they could have removed
5   the warrant entirely from the system but it didn't process at
6   that point.  It could be that the warrant was already served
7   and it just hadn't been returned from the system.
8   Q.  So in the hundreds of traffic stops that you've done in
9   your career, have you seen it go both ways?
10  A.  I've never seen a non-extraditable warrant.  I've
11  actually never done a full extraditable warrant, but I have
12  seen situations where I've stopped somebody who showed a
13  warrant and they'd already been served on that warrant in the
14  system.
15         THE COURT:  What did you say?  You've never seen a
16  non-extraditable warrant?
17         THE WITNESS:  I've never done an extradition warrant
18  myself, sir.  I've never had a warrant return as extraditable
19  for myself.  I've participated with other officers but
20  haven't done one myself.
21  BY MR. BUTLER:
22  Q.  So walk through that protocol.  You see it's
23  non-extraditable.  So what is the protocol that you are to
24  follow?  You said to call the dispatcher.  And then what?
25  A.  Correct.  So first we switch to our records channel --

K. Byrd - Direct

1    it's a nonprimary dispatch channel -- and advise the

2    dispatcher that there's a possible warrant in the system.

3    They will then run it through the terminal they're linked to

4    and advise if it exists in their terminal as well.

5    Q.   Okay.

6    A.   From there, it goes to our Operations section.

7    Q.   Why does it go from the dispatcher to the Operations

8    section?

9    A.   The dispatcher -- they move on the fly.  They do a lot of

10   things at once.  The particular records dispatcher is in

11   charge of things like calling tow trucks for car crashes,

12   calling other agencies, for example, if we had a robbery

13   nearby the city line.  That dispatcher is in charge of a lot

14   of things.

15          So because a warrant confirmation is a lengthy

16   process, after the initial observation of, yes, we do have a

17   warrant that we can observe, we have to go to the Operations

18   channel because they're the ones who do confirmation.

19          THE COURT:  And you do that on all the warrants that

20   you get; is that right?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Even though you've never had one that

23   says they're extraditable?

24          THE WITNESS:  Correct.

25   BY MR. BUTLER:

K. Byrd - Direct

1   Q.  So how long was it from the time that you contacted the

2   dispatcher to the time that the VCIN Operations person

3   contacts you with the update on the status of the warrant?

4   A.  From -- are you saying from the original dispatcher, the

5   records dispatcher?

6   Q.  Right.

7   A.  Approximately ten minutes.  Maybe nine to ten minutes.

8   Q.  And how long after your initial stop at 12:06 did

9   Detective Rombs show up with his K-9?

10  A.  He was there about five minutes later.

11  Q.  And you know that because of the -- you read the

12  dispatcher records?

13  A.  Correct, both, the timestamp and the timestamp on the

14  camera when he walks into the camera frame.

15  Q.  During the time that you are waiting -- to be clear, at

16  what time did the VCIN Operations get back to you about the

17  status of this warrant?

18  A.  That was at approximately 12:22.  Or 12:21 to 12:22.

19  Q.  In the time before 12:22, what are you observing?

20  A.  Just speaking with Mr. Howell outside the vehicle, asking

21  him about the warrant, if he knew there was a warrant for his

22  arrest.

23  Q.  And did you participate in the search of the vehicle?

24  A.  No.

25          MR. BUTLER:  Those are all the questions I have.

—————————————K. Byrd - Cross—————————————

1          THE COURT:  When did the drug-sniffing dog get

2     there?

3          THE WITNESS:  That was at 12:11, sir.

4          THE COURT:  Okay.  Thank you.

5                         CROSS-EXAMINATION

6     BY MR. BROCCOLETTI:

7     Q.  Good afternoon, sir.  How are you?

8     A.  Good.  How are you?

9     Q.  Good, thank you.

10          You knew this was a narcotics investigation?

11    A.  Yes.

12    Q.  You had been alerted by Detective Beha that it was a

13    narcotics investigation?

14    A.  I don't recall which detective I spoke to.

15    Q.  But you recognized that this stop of the vehicle was

16    intertwined with a narcotics investigation that they were --

17    ongoing?

18    A.  Correct.

19    Q.  You knew that there was a drug dog that was in the area?

20    A.  Yes.

21    Q.  You knew that the drug dog was going to be part of the

22    investigation into Mr. Howell and the car?

23    A.  Correct.

24    Q.  How many other officers were in position, so to speak?

25    A.  To my knowledge, just my car, and I was training, and

———————K. Byrd - Cross———————

1    then the other officer with the dog.

2    Q.   Officer Rombs?

3    A.   I was not aware he was in the area, no, sir.

4    Q.   Officer Beha has testified that he had contacted you

5    sometime around 10:00 in the morning.  Would that be

6    accurate?

7    A.   About.

8           MR. BUTLER:  Objection.  I believe that's misstating

9    what Detective Beha --

10          THE COURT:  Well, he asked him whether it's

11   accurate.  We'll see what the answer is.

12          THE WITNESS:  I don't know the exact time.  It was

13   that morning.

14   BY MR. BROCCOLETTI:

15   Q.   It was sometime before the stop of the vehicle, though?

16   A.   Yes, sir.

17   Q.   Would it be fair to say that he had been in contact with

18   you several times, four or five, six times, prior to the stop

19   of the vehicle?

20   A.   I wouldn't say that many, no, sir.

21   Q.   How many would you say?

22   A.   Maybe two or three that I can recall.

23   Q.   And can you recall the substance of the conversation that

24   you had with him and what he told you to do?

25   A.   The first was that there was the black SUV with

———————K. Byrd - Cross———————

1    out-of-state plates that they were investigating for a

2    narcotics infraction and that the driver of the vehicle had a

3    possible warrant.  They asked me to assist them in stopping

4    the vehicle.  And then the second was once, I guess, they

5    were in position -- I'm not exactly sure -- that they were

6    there, and then I believe the third was that they were

7    moving, essentially.

8             THE COURT:  So when you get something like this,

9    which I think it happens from time to time, do you sort of go

10   station yourself somewhere so that you are likely to be able

11   to intercept this car?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  So they call you, and they say, We've

14   got this person that we may want you to go get, he's at the

15   Aloft, can you hang around there? -- is that pretty much what

16   they ask you to do?

17            THE WITNESS:  Yes, sir.  They asked me if I was

18   nearby the -- well, they didn't say the hotel.  They said the

19   Crossways Boulevard, which is that road that it's on, and

20   then I was already in that area, so I just waited.

21            THE COURT:  And they just happened to get you?

22            THE WITNESS:  I would -- they called me knowing that

23   I'm reliable, perhaps.  No offense to my other coworkers.

24            THE COURT:  Well, are you a reliable informant?  You

25   are.  Okay.  Well, that's good.  I'm glad they found you

─────K. Byrd - Cross─────

1    reliable.

2            THE WITNESS:  Thank you, sir.

3            MR. BROCCOLETTI:  May I proceed, Your Honor?

4            THE COURT:  Yes, please.

5    BY MR. BROCCOLETTI:

6    Q.  When he first -- when the detective first contacted you,

7    you talked about the black car and et cetera, et cetera --

8    did he give you the name of the individual?

9    A.  Yes.

10   Q.  Did he tell you that the individual potentially had a

11   warrant out in Georgia?

12   A.  Yes.

13   Q.  Did he tell you anything about that the information on

14   the warrant said confirm that the warrant is still

15   outstanding?

16   A.  I don't recall that.

17   Q.  Did he ask you to do anything on your laptop, on your MDS

18   system, to confirm the existence of the warrant prior to the

19   time of the stop?

20   A.  Not to my recollection.

21   Q.  You had that ability to, though?

22   A.  If I would have had all the -- name, date of birth,

23   Social, I can do that, yes, sir, I can.

24   Q.  But that was never asked of you, just to be clear?

25   A.  Correct.  Not to my recollection, it was not.

K. Byrd - Cross

1   Q.   So at the time the vehicle was stopped at about 12:06,

2   obviously it wasn't stopped for any traffic infraction?

3   A.   Correct.

4   Q.   Or for the license plates?

5   A.   Correct.

6   Q.   It was stopped because the officers asked you to stop it?

7   A.   Correct.

8   Q.   Had you done any work on your MDS to determine the

9   outstanding warrant?  Had you done anything?

10  A.   At the time, prior to the stop, no, sir.

11  Q.   So you stopped the vehicle.  You had a partner with you,

12  right?

13  A.   Yes.

14  Q.   And your partner was Officer Weeks?

15  A.   Correct.

16  Q.   And this was on a body cam, right?

17  A.   We both had them, yes, sir.

18  Q.   You both had body cams.

19  A.   Yes, sir.

20  Q.   Have you been able to review the body cam prior to your

21  testimony today?

22  A.   I have.

23  Q.   I'm just going to ask you if these are some things that

24  you recall saying.

25           You said, "Well, let's check and make sure it's

1   him."  Do you recall that?

2   A.  Correct.

3   Q.  And then Officer Weeks said, "He's wanted," right?

4   A.  Yes.

5   Q.  And then you responded, "No extradition.  Pick up only.

6   Howdy."  H-o-w-d-y.

7          Did you know at that point, prior to the time that

8   you actually got to Mr. Howell?

9   A.  No.  Once I went back to the vehicle, when I ran him is

10  when I saw that it said non-extraditable.

11  Q.  And do we have a record of that?  Do you have a

12  screenshot of that or anything, of what your MDS system says?

13  A.  I do not, no, sir.

14  Q.  What did it say specifically, do you recall?

15  A.  In terms of the extradition?

16  Q.  Yes, sir.

17  A.  The way that a VCIN/NCIC hit works is it's got a lot of,

18  like, categories, and it will have "Name," and it will say

19  the person's last, first; date of birth; Social; license

20  number, whatever it may be.  And then it has a field that

21  says what the warrant is for, what the ORI is for, and then

22  it's got a bunch of, like, miscellaneous information, such as

23  if the person is perhaps a known drug user.

24          And in this situation, as I was reading it, that's

25  what I was reading, so the name of the person, the date of

K. Byrd - Cross

1   birth.  Because it works on recognition.  So if it's someone
2   who has the same name but a different birthday, it may
3   appear, or the same birthday with a similar name, it may
4   appear.  So that's why I was reading through that page.
5   Q.  I understand.
6           And at that point, as you discover that there's a
7   possible active warrant with no extradition, Officer Rombs
8   shows up?
9   A.  Yes.
10  Q.  And he's the officer with the drug dog?
11  A.  Yes.
12  Q.  And Officer Rombs tells you, "Well, if he has a warrant,
13  just detain him"?
14  A.  Correct.
15  Q.  Then you said, "Yeah, we're checking it now."  And then
16  he says something about "instant pickup."  What does that
17  mean, "instant pickup"?  Do you know what that means?
18  A.  Instant, like, immediate?
19  Q.  Instant, yes.  "Instant pickup," do you know what he
20  meant by that?
21  A.  No, I don't know what that means.
22  Q.  And then you're talking about there's a female with him,
23  as well, in the front passenger's seat.  Do you recall that?
24  A.  Correct.
25  Q.  And then Officer Rombs says, "Let's detain him first"?

——————————K. Byrd - Cross——————————

1    A.  Yes.

2             THE COURT:  How do you spell Rombs?

3             MR. BROCCOLETTI:  R-o-h-m-s [sic].

4    BY MR. BROCCOLETTI:

5    Q.  And at that point, that's when you go back to the vehicle

6    and have Mr. Howell step out of the car?

7    A.  Correct.

8    Q.  Do you recall that?

9    A.  Yes.

10            MR. BROCCOLETTI:  Thank you very much, Your Honor.

11            THE COURT:  You were getting ready to tell me that

12   that's not how you spell Rombs.

13            THE WITNESS:  Correct.

14            MR. BROCCOLETTI:  Oh, sorry.

15            THE COURT:  Well, he's reliable, so how is Rombs

16   spelled?

17            THE WITNESS:  R-o-m-b-s.

18            THE COURT:  When did you first see Mr. Howell?

19            THE WITNESS:  I saw Mr. Howell -- himself or the

20   vehicle?

21            THE COURT:  The car.

22            THE WITNESS:  That was at approximately the area of

23   Crossways Boulevard and Volvo Parkway.

24            THE COURT:  Let's pretend I'm not from Chesapeake.

25            THE WITNESS:  Yes, sir.

K. Byrd - Redirect

```
 1              THE COURT:  How far is that from where you stopped
 2    him?
 3              THE WITNESS:  Maybe -- I apologize, I'm not very
 4    good with distance.  Maybe two miles, a little bit less.
 5              THE COURT:  So you followed him for two miles?
 6              THE WITNESS:  The vehicle was far -- it was up ahead
 7    of me.  So by the time I actually got to where I may define
 8    it as following was maybe half a mile.
 9              THE COURT:  So how long were you in contact with him
10    before you turned on your blue lights and stopped him?
11              THE WITNESS:  What do you mean by "contact," sir?
12              THE COURT:  Well, following the law, you were --
13    obviously you didn't just swoop down on him.
14              THE WITNESS:  Yes, sir.  Once I got behind his
15    vehicle, it was about a half mile.  So at a roadway that's 25
16    miles per hour, only enough time for me to contact dispatch
17    to advise them that I was doing a traffic stop.
18              THE COURT:  A couple of minutes?
19              THE WITNESS:  If that, yes, sir.
20              THE COURT:  Thank you.
21                        REDIRECT EXAMINATION
22    BY MR. BUTLER:
23    Q.  Do you remember when the defense attorney asked you
24    whether or not Detective Beha made a request of you to check
25    your MDS prior to initiating the stop?  Do you remember when
```

K. Byrd - Redirect

1   he asked you that question?

2   A.  I recall the question, yes.

3   Q.  Per your department policy, when are you authorized to

4   call dispatch for the status of a warrant?

5   A.  We have to have a detention in play.  So we have to --

6   whether handcuffed or not, the person has to be detained by a

7   law enforcement officer to contact dispatch to confirm a

8   warrant.

9           MR. BUTLER:  Thank you.

10          THE COURT:  Anything further of this witness?

11          MR. BROCCOLETTI:  No, Your Honor.  Thank you.

12          THE COURT:  Anything further?

13          MR. BUTLER:  No, Your Honor.

14          THE COURT:  May he be excused?

15          MR. BUTLER:  Yes, Your Honor.

16          THE COURT:  Officer Byrd, thank you very much.  I

17  appreciate you coming today.

18          (The witness was excused.)

19          MR. BUTLER:  At this time, the United States calls

20  its last witness, Detective Clinton Rombs.

21          MR. BROCCOLETTI:  Judge, I apologize for spelling

22  his name wrong.

23          THE COURT:  That's all right.

24          MR. BROCCOLETTI:  With my last name, I do that

25  often.

———C. Rombs - Direct———

```
 1              (The witness was affirmed.)
 2              CLINTON ROMBS, called by the Government, having been
 3    first duly affirmed, was examined and testified as follows:
 4                        DIRECT EXAMINATION
 5    BY MR. BUTLER:
 6    Q.  Sir, could you state your name and kindly spell your last
 7    name.
 8    A.  Yes.  Detective C. J. Rombs, R-o-m-b-s.
 9    Q.  And, Detective, by whom are you employed?
10    A.  I'm employed by the Chesapeake Police Department.
11    Q.  How long have you been with the Chesapeake Police?
12    A.  Nine-and-a-half years.
13    Q.  Which division are you assigned to?
14    A.  I'm currently assigned to the Vice and Narcotics section.
15    Q.  Other than being associated with Vice and Narcotics, do
16    you have any special training?
17    A.  Yes.  In addition to being a Vice and Narcotics
18    detective, I'm a narcotic detection dog handler.
19    Q.  What is the name of your K-9 partner?
20    A.  K-9 Doug, D-o-u-g.
21    Q.  And what breed is Doug?
22    A.  He's a Belgium Malinois.
23    Q.  What is Doug trained to do?
24    A.  He's trained to detect the odor of five illegal
25    narcotics, which are marijuana, heroin, cocaine, ecstasy, and
```

C. Rombs - Direct

```
 1   methamphetamine.
 2   Q.  And as part of your work handling Doug, do you sometimes
 3   assist with traffic stops?
 4   A.  Yes.
 5   Q.  How many traffic stops would you approximate you've used
 6   a K-9?
 7   A.  Hundreds.
 8   Q.  And let's talk about one on September 27th of 2019.  Were
 9   you on duty that day?
10   A.  Yes.
11   Q.  And around noon did you assist with a traffic stop?
12   A.  Yes, I did.
13   Q.  Prior to the traffic stop, were you briefed about any of
14   the circumstances surrounding the traffic stop?
15   A.  Yes.
16   Q.  And what was your understanding?  How did you come to
17   learn about this?
18   A.  I was in court at the time, and my boss informed me that
19   Detectives Milewczik and Detective Beha knew about a known
20   narcotic trafficker at a local hotel in the city of
21   Chesapeake, and they were -- when I first found out about it,
22   they were looking to organize a team to investigate this.
23   Q.  All right.  And other than your boss, was there any other
24   communications you were receiving?
25   A.  So when I got out of court and I went home to retrieve
```

73

C. Rombs - Direct

1   K-9 Doug, I overheard the radio traffic that was happening on
2   the radio.
3   Q.   And hearing the radio traffic, were you aware of when the
4   stop was initiated?
5   A.   Yes.
6   Q.   What time was that?
7   A.   Approximately 12:06.
8   Q.   And what time did you show up?
9   A.   12:11.
10  Q.   How are you so precise with the time when you showed up?
11  A.   So when you communicate a traffic stop over the radio,
12  our emergency dispatch system documents that time in our
13  computer database, and I reviewed that computer database.
14  Q.   So what did you see when you pulled up?
15  A.   I saw a black Cadillac SUV that appeared to be stopped by
16  Officer Byrd and Officer Weeks.  Officer Byrd -- when I
17  arrived on the scene, Officer Byrd and Officer Weeks were
18  sitting inside of their patrol vehicle with their emergency
19  equipment activated.
20  Q.   What was the first thing that you did?
21  A.   Walked up to Officer Byrd's window, and this is when he
22  informed me that the driver of the vehicle was wanted.
23  Q.   And so what happened next?
24  A.   I advised that if he was -- indicated he was wanted, that
25  we should detain that individual, which was later found to be

Carol L. Naughton, Official Court Reporter

───────C. Rombs - Direct───────

1    Xavier Howell.

2    Q.  And then once he was detained, what did you do?

3    A.  While he was being detained, I walked around to the

4    passenger's side of the vehicle and had the passenger step

5    out with her baby.

6              THE COURT:  Of Mr. Howell's vehicle?

7              THE WITNESS:  Yes, sir.

8    BY MR. BUTLER:

9    Q.  After the female passenger exited the vehicle with her

10   baby, what did you do?

11   A.  Well, I initially started to walk back when I was stopped

12   by Mr. Howell.  He was asking why I had her step out and was

13   asking what I was doing there.  After I informed him what I

14   was going to do, I was going to deploy a K-9 dog around the

15   exterior of the vehicle for an open-air sniff.  I retrieved

16   K-9 Doug from my patrol vehicle and deployed him in the air

17   around the black Cadillac SUV.

18             THE COURT:  Were you in a uniform at that time?

19             THE WITNESS:  I was in plain clothes.  I had a tac

20   vest on identifying myself as police.

21             THE COURT:  Were you in a police car or in an

22   unmarked car?

23             THE WITNESS:  It was an unmarked police car.

24   BY MR. BUTLER:

25   Q.  So tell the Judge about the free-air sniff.  How does it

————————C. Rombs - Direct————————

1    work?

2    A.  So that one -- I typically -- an open-air sniff, I'll

3    bring Doug to the area.  He's on a leash.  I'll typically

4    give him a command to find the odor, if there's any odor

5    present, search the area, sniff the area, and I allow him to

6    go around whatever area I need him to go around.

7            In this particular instance, as I walked him up to

8    the vehicle, the driver's door was already open, and I

9    observed K-9 Doug alert to the odor of illegal narcotics.  I

10   observed his body behavior change.  His breathing

11   intensified.  It became more rapid.  You could see his ribs

12   fluttering on his side, and you could see him working the

13   odor in a cone shape, which is typical when he's in odor of

14   illegal narcotics.  And then he worked the odor to the side

15   of the driver's seat, underneath the seat.

16   Q.  From the time that you deployed Doug out of your vehicle

17   and you approached the defendant's vehicle, approximately how

18   long did it take for Doug to alert?

19   A.  From the time I got him out of my vehicle --

20   Q.  Yes.

21   A.  -- is the question?

22           Approximately 30 seconds or so.

23   Q.  And --

24           THE COURT:  How long had you been there when you got

25   Doug out of the car?

———————C. Rombs - Direct———————

1        THE WITNESS:  So from the time I arrived to the time
2    I got him out of the car was approximately five minutes.
3        THE COURT:  And during that time, you went and you
4    got the woman out of the car --
5        THE WITNESS:  Yes, Your Honor.
6        THE COURT:  -- and talked to Byrd and so forth?
7        THE WITNESS:  Yes, Your Honor.
8    BY MR. BUTLER:
9    Q.  And that also included the time the defendant was asking
10   you all those questions about what you were doing?
11   A.  That's correct.  The defendant was asking me questions,
12   and the passenger was also asking questions about why she
13   needed to get out of the vehicle.
14   Q.  Was the alert -- is it accurate to say that it was
15   sometime around 12:16 or 12:17?
16   A.  That's correct.
17   Q.  Because you arrived at 12:11?
18   A.  That's correct.
19   Q.  What did Doug alert on specifically?
20   A.  He initially alerted to the -- underneath the driver's
21   seat, on the side.  Based on that alert, I allowed him to go
22   inside the vehicle, where he alerted to a baby diaper bag in
23   the back, a black duffel bag in the back, and a United States
24   Postal Service box, which was also in the back of the
25   vehicle.

Carol L. Naughton, Official Court Reporter

—————————C. Rombs - Cross—————————

1   Q.  When he alerted on those items -- the black duffel bag,

2   the baby diaper bag, and the U.S. Postal box -- what did you

3   do?

4   A.  Secured K-9 Doug and then began to search the vehicle.

5   Q.  What did you find?

6   A.  Inside of the United States Postal Service box was

7   approximately 2 kilograms of methamphetamine.

8           MR. BUTLER:  Those are all the questions I have for

9   you.  Please stand by for cross-examination.

10                      CROSS-EXAMINATION

11  BY MR. BROCCOLETTI:

12  Q.  Good afternoon, sir.

13  A.  Good afternoon.

14  Q.  Approximately what time was it that you were contacted

15  while you were in court that you may be needed for this?

16  A.  I don't know, sir.

17  Q.  But you had to leave court to go back to your house?  Is

18  that what I understand?

19  A.  I did leave -- I was already getting out of court, but

20  that's what I did.  After I left court, I went back to my

21  house.  I live fairly close to the courts.

22  Q.  And the dog lives with you?

23  A.  Yes, sir.

24  Q.  So you recognized, obviously, because you've been in this

25  situation before, that this was a narcotics investigation?

C. Rombs - Cross

1    A.   Yes.

2    Q.   And you recognized what your purpose and your role would

3    have been, which is to deploy your dog as you did?

4    A.   Yes.

5    Q.   Had you learned anything about the defendant's name or

6    conduct or anything of that nature prior to this, prior to

7    the time of the stop?

8    A.   Not that I recall.  I just recall knowing that it was

9    known to them -- that that was communicated over the radio

10   that it was a known narcotic trafficker.

11   Q.   Did you come upon the scene after the stop had occurred,

12   or were you in a different staging area?

13   A.   I came straight from my house, and I arrived to the scene

14   of the traffic stop after the traffic stop was initiated.

15   Q.   How long after the traffic stop was initiated?  I think

16   the traffic stop was at 12:06.

17   A.   12:06.  I arrived at 12:11.

18   Q.   And at that point, was the defendant still in the

19   vehicle?

20   A.   Yes, sir.

21   Q.   And the girl was still in the vehicle?

22   A.   Yes, sir.

23   Q.   And you came back to talk for Officer Byrd and Officer

24   Weeks?

25   A.   I went straight to Officer Byrd and talked to them when I

———C. Rombs - Cross———

1    arrived.

2    Q.  Was there a discussion that you had with Officer Byrd

3    about this particular warrant being outstanding and not being

4    extraditable?

5    A.  That part was not discussed.

6            MR. BROCCOLETTI:  Thank you, Your Honor.

7            THE COURT:  Redirect?

8            MR. BUTLER:  No, Your Honor.

9            THE COURT:  Thank you very much.  May this witness

10   be excused?

11           MR. BUTLER:  Yes, Your Honor.

12           THE COURT:  Thank you, Detective Rombs.  I

13   appreciate it.

14           THE WITNESS:  You're welcome, sir.

15           (The witness was excused.)

16           THE COURT:  Any further witnesses?

17           MR. BUTLER:  No, Your Honor.

18           THE COURT:  Do you have any witnesses,

19   Mr. Broccoletti?

20           MR. BROCCOLETTI:  We do not, Your Honor.  Thank you.

21           THE COURT:  All right.  Well, let's hear from the

22   government on this.

23           It seems to me that this case turns on the warrant.

24   The rest of the stuff just doesn't get them anywhere near

25   where they need to be to stop this fellow.  Legal driving, I

```
1    don't think really gets you too far, and going in and out of
2    hotels.
3              MR. BUTLER:  No, but, Your Honor, I do want to go
4    back to what the -- put the warrant aside for a second.
5              THE COURT:  Well, I'd like you to focus on the
6    warrant because that's the thing that concerns me in this
7    case.
8              MR. BUTLER:  All right.  The warrant is -- first of
9    all, to get an arrest warrant, it has to be based on probable
10   cause.  So they have this policy that they cannot check the
11   status of the warrant until the target is in -- until they've
12   detained him.  That's the testimony.
13             THE COURT:  Or in contact.
14             MR. BUTLER:  Or in contact, that's right.
15             And based on their training and experience, they
16   understand that to be, in this particular circumstance,
17   somebody who is stopped, here in a traffic stop, and they
18   have, you know -- they've got custody of him.
19             And so there's a process.  They call the dispatcher.
20   The dispatcher calls the Operations Center.  And it's the
21   Operations Center that is reaching back out to the
22   jurisdiction, because, as Detective Beha testified, sometimes
23   the status of warrants can change, either in the defendant's
24   favor where it appears to be active but, in fact, it may not
25   be, or the other way around.
```

1              And so they were following their policy on this

2     arrest warrant, and by the time they get the information back

3     on the status of the warrant, the drug dog had already

4     alerted.  The drug dog had already alerted five minutes

5     before the VCIN Operations personnel said this is

6     non-extraditable.  And the search had -- the dog had already

7     alerted, and by the time he had alerted --

8              THE COURT:  Well, the only way they can stop this

9     fellow, it seems to me, is based on the warrant.

10             MR. BUTLER:  I think, though, that they --

11             THE COURT:  If they're not allowed to rely on that

12    information that they had a warrant, they have no reason to

13    stop him.

14             MR. BUTLER:  Well, I think that there is a

15    reasonable suspicion based on their prior investigation of

16    this defendant.  They know that a business, which he's a

17    director of -- there's a controlled purchase --

18             THE COURT:  Five years ago.

19             MR. BUTLER:  But then, in subsequent years

20    following, multiple confidential informants are talking about

21    this defendant and his involvement in drug trafficking.  He's

22    got the criminal history of possession with intent to

23    distribute.

24             The confidential informant in September says -- this

25    is important.  Even though he says there's a target who is

1    not the defendant that's going to be here, he says he's

2    meeting with other drug dealers, and they see this defendant,

3    who they know to be involved in drug trafficking, on that

4    registry, showing up in this rental car, which, based on

5    their training and experience, is something consistent with

6    what drug traffickers want to do; use cars that don't get

7    registered back to them, stay in hotels like this Aloft Hotel

8    where Detective Beha has made multiple drug arrests, has made

9    multiple drug seizures.

10          So we think that there's a number of reasons in the

11   totality of circumstances that would give them the reasonable

12   suspicion that something was afoot.

13          And then as it goes to this argument that it was a

14   prolonged stop, we cited some --

15          THE COURT:  All right.  I don't think it's a

16   prolonged stop.  This is what I think this case turns on:

17          If they're allowed to stop him because of the

18   warrant, it's a good stop, but otherwise, it's not.  That's

19   how I look at this.

20          MR. BUTLER:  Yes, Your Honor.

21          THE COURT:  Because I think that all of this other

22   stuff is just a lot of "who shot John" from past years and

23   rumors from an informant who turned out to be absolutely off

24   the money in this particular case.

25          MR. BUTLER:  And based on the way that you see the

1    case, Your Honor, these officers are acting on good faith.
2    They see an active arrest warrant, and their policies require
3    that this person be detained before they can verify the
4    status.
5         And as we cited sort of in the motion, too, this
6    good faith is trying to root out police misconduct, systemic
7    errors, reckless disregard of constitutional requirements,
8    and based on the testimony that you hear here today, we don't
9    have any of that.
10        We have officers who are following their policies,
11   and they saw an active warrant, and they executed per their
12   policies on the warrant, Your Honor.
13        THE COURT:  Thank you.
14        All right, Mr. Broccoletti.
15        MR. BROCCOLETTI:  Your Honor, I'll just get right to
16   the point.  What does the word "confirm" mean?  Confirm.
17   That's exactly what the first word is.  "Wanted - confirm
18   that the want is still outstanding."  Counsel says that --
19        THE COURT:  Well, that's in what?
20        MR. BROCCOLETTI:  VCIN, Your Honor, Government's
21   Exhibit 1.
22        THE COURT:  Exhibit 1 is not the VCIN; it's the
23   Chesapeake policy.
24        MR. BROCCOLETTI:  No, Your Honor.
25        THE COURT:  Oh, you're right.  It's the warrant --

1   or the printout.

2         MR. BROCCOLETTI:  Yes.

3         So I think the government's argument that, well,

4   here we have a situation where the officers have to determine

5   if there's a change in the status of the report or a change

6   in the status of the warrant and whether it's still

7   outstanding and whether it's been served, and so on and so

8   forth, and in order to be able to verify that, we have to

9   stop him, detain him, possibly put him in handcuffs, and then

10  we'll find out.  That, to me, just doesn't make any sense

11  whatsoever.

12        And when the warrant itself says "confirm," and they

13  have multiple opportunities to confirm it -- now, you may not

14  want to pick up the phone and call, because the sheriff's

15  office in Crawfordville, Georgia, may say we don't know who

16  we're talking about, they had multiple opportunities from

17  10:00 a.m. to 12:00 p.m. to ascertain the validity of this

18  particular warrant.

19        The detective is in contact with the officer four or

20  five times.  He has been in "contact," as the word that we're

21  using today -- Detective Beha -- with Mr. Howell since 2014.

22  He's been following him on Facebook and social media.

23        THE COURT:  I don't think that's what they mean by

24  being in contact.

25        MR. BROCCOLETTI:  I understand.  I'm being

1    facetious.  I apologize.

2          But the point is he knows him.  He's got his

3    pedigree.  He's got his date of birth.  He's got his Social.

4    He has everything that he needs to have to be able to verify

5    the existence of this warrant and whether it's changed.

6          And to me, from a constitutional standpoint, the

7    intrusion word that I used before is much less intrusive by

8    going through the channels and methods that they had to

9    determine this warrant when they're alerted that it has to be

10   confirmed as opposed to stopping an individual, detaining

11   him, subjecting him to the drug dog and everything else that

12   followed.

13         So the point that I'm trying to make, Your Honor, is

14   this is a drug investigation.  They wanted to stop him.  They

15   needed a reason to stop him.  They knew that there wasn't

16   enough evidence from the 2014 and 2017 circumstances and

17   hearsay to stop him, so they needed to have a reason to stop

18   him.

19         It's interesting that they stopped him with a team

20   which included a drug dog.  So we know what they're stopping

21   him for.  Let's be honest about it.  They stopped him because

22   they wanted to be able to get into the car, and that's what

23   they used the dog for, and they used the warrant to be able

24   to get in there.

25         But they didn't do anything that they easily could

1  have done to verify the existence of the warrant.  And in

2  their own words, "We're supposed to do that so we can check

3  and see if the status of the warrant has changed."

4          I'd suggest to the Court the way to do that is the

5  appropriate way, through the appropriate methods that were

6  available to them, and not to stop a citizen and subject him

7  to this.

8          THE COURT:  Well, the police officer said that

9  they're not allowed to do that, under the way things work in

10  Chesapeake.  What is your response to that?

11          MR. BROCCOLETTI:  Well, I think the Court, from a

12  constitutional standpoint, can see that the procedure that

13  they've adopted is not a valid constitutional procedure, but

14  they had the ability -- while we may say and you may argue

15  that Detective Beha did not have a, quote/unquote, "laptop"

16  from which to do his MDS search, he certainly had the ability

17  to radio the dispatcher, the same way that the officer did,

18  and have the dispatcher run the material the same way the

19  officer did.

20          THE COURT:  Well, but they say that the dispatcher

21  won't do that until they have somebody in custody.

22          MR. BROCCOLETTI:  That makes --

23          THE COURT:  It's sort of a catch-22.

24          MR. BROCCOLETTI:  It is.  But the officer -- and I

25  think the words that the Court used before are "in contact."

1    Clearly the officers are in contact with the defendant.
2    They're in contact with him from the time that they see him.
3    They have his pedigree.  They have the ability.  There's no
4    reason in the world for Detective Beha not to have told
5    Officer Byrd to run it through the MDS, because that's the
6    proper procedure.

7            If they wanted to be sure that the warrant existed,
8    if they wanted to be sure that they were making a correct
9    stop, it would have been simple to do that.

10           Thank you, Your Honor.

11           THE COURT:  All right.  Thank you.

12           Mr. Butler, do you want to respond to that?

13           MR. BUTLER:  We can argue about what "in contact"
14   means.  I mean, we can argue that "in contact" is you're
15   having communication, you're verifying that this individual
16   is who they suspect him to be, but at the end of the day --
17   you mentioned it in your question to defense counsel.

18           What defense counsel is ignoring -- and he's saying
19   they should have made a phone call, it would have been
20   reasonable, it's not taking up too many resources.  But
21   that's not their policy.  Their policy --

22           THE COURT:  Well, the reasonableness does have
23   something to do with the Fourth Amendment.

24           MR. BUTLER:  Of course.  But, Your Honor, what they
25   saw -- and as you evaluate the good faith here, they saw an

1  active arrest warrant.  They followed their rules.  And prior

2  to getting the results of the status of the warrant, the dog

3  has already alerted on the vehicle, and they find this

4  methamphetamine, Your Honor.

5          THE COURT:  All right.  Okay.  Thank you very much.

6          I'm going to probably write something about this,

7  and I'll get back to you on it.

8          Now, we were supposed to talk about another case

9  today; is that right?

10         MR. BOSSE:  Your Honor, that's not with

11 Mr. Broccoletti.  That's one of my other cases, and I think

12 there's a 2:30 hearing on that.

13         THE COURT:  Okay.

14         MR. BROCCOLETTI:  But Your Honor did ask me to

15 confirm that January 25th date, as the jail bells and

16 whistles were going off in the background on the other day's

17 phone call.

18         THE COURT:  Right.

19         MR. BROCCOLETTI:  And I am available on that date,

20 Your Honor.

21         THE COURT:  What case are we trying that day?

22         MR. BROCCOLETTI:  This case, Your Honor.  Because I

23 think the Court suggested that date.

24         THE COURT:  Right.  Okay.  Thank you very much.  I

25 appreciate that.

1          All right.  In that case, then, thank you very much.
2     It was a good job by counsel.  I really appreciate it.  It's
3     good to have good lawyers.
4          And we'll recess court until 2:00.  Thank you all
5     very much.
6          (Proceedings adjourned at 12:42 p.m.)
7
8
9                         CERTIFICATION
10
11        I certify that the foregoing is a correct transcript
12    from the record of proceedings in the above-entitled matter.
13
14
15        _____/s/_____
16                    Carol L. Naughton
17                    August 19, 2021
18
19
20
21
22
23
24
25

Carol L. Naughton, Official Court Reporter