1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                      NORFOLK DIVISION

 3

 4   UNITED STATES OF AMERICA,     )
                                   )
 5              Plaintiff,         )
                                   )
 6   v.                            )    Criminal Action No.:
                                   )         2:20cr11
 7   XAVIER HOWELL,                )
                                   )
 8              Defendant.         )

 9

10                  TRANSCRIPT OF PROCEEDINGS

11                        (Sentencing)

12                     Norfolk, Virginia
                       November 12, 2021
13

14

15   BEFORE:    THE HONORABLE JOHN A. GIBNEY
                United States District Judge
16

17

18   Appearances:

19         OFFICE OF THE UNITED STATES ATTORNEY
                  By: Andrew C. Bosse
20                     Amanda L. Turner
                       Counsel for the United States
21
           ZOBY & BROCCOLETTI
22                By: James O. Broccoletti
                       Counsel for Defendant
23
           The Defendant appearing in person.
24

25
```

```
1                    P R O C E E D I N G S

2

3           (Commenced at 10:22 a.m. as follows:)

4

5           COURTROOM DEPUTY CLERK:  In Case No. 2:20cr11, the

6   United States, represented by Andrew Bosse and Amanda Turner, v.

7   Xavier Howell, represented by James Broccoletti.

8           Mr. Bosse, is the government ready to proceed?

9           MR. BOSSE:  Government's ready.  Good morning, Your

10  Honor.

11          COURTROOM DEPUTY CLERK:  Mr. Broccoletti, is the

12  defendant ready to proceed?

13          MR. BROCCOLETTI:  Good morning, Your Honor.  Present

14  and ready.

15          THE COURT:  All right.  Good morning Mr. Bosse, Ms.

16  Turner, Mr. Broccoletti, Mr. Howell.  Good morning to all of

17  you.

18          We're here today for Mr. Howell's sentencing.  And

19  let's see, Mr. Broccoletti, have you and Mr. Howell both had a

20  chance to review the presentence report and to discuss it?

21          MR. BROCCOLETTI:  We have, Your Honor.

22          THE COURT:  And I know you have some objections that

23  you filed, but I think what I'm advised today is that you are

24  not going to pursue those other than the leader and organizer

25  objection; is that right?
```

1          MR. BROCCOLETTI:  That's correct, Your Honor.

2          THE COURT:  All right.  Have you gone over with

3   Mr. Howell the standard conditions of supervised release which

4   are included in the PSR?

5          MR. BROCCOLETTI:  I have, Your Honor.

6          THE COURT:  All right.  Good.  Okay.  I will adopt --

7   well, let's -- does anybody have any evidence to put on

8   regarding the objections in this case?

9          MR. BOSSE:  No evidence, Your Honor, only argument.

10          MR. BROCCOLETTI:  No evidence, just argument.

11          THE COURT:  I'm kind of in a good position on this

12   because I heard the trial in the case and so I know most of the

13   details -- many of the details of what happened.

14          All right.  Then Mr. Bosse, let's hear you on the

15   leader/organizer aspect of this.

16          Hold on one second here while I get that guideline.

17          All right.  Go ahead, Mr. Bosse.

18          MR. BOSSE:  Yes, sir.  And this is under 3B1.1 of the

19   sentencing guidelines.

20          THE COURT:  Yes, right.

21          MR. BOSSE:  The probation office applied the

22   four-level enhancement for the defendant being an organizer or

23   leader of an activity, criminal activity that involved five or

24   more participants or was otherwise extensive.  Both of those

25   prongs on the second half of the inquiry apply here.  I don't

1    think there's going to be an argument that the criminal activity

2    that's charged didn't involve five or more participants.  The

3    trial made it clear that there's five people, first of all in

4    the indictment, and that there were numerous others who were

5    involved, lower-level dealers involved.  There was another one

6    who was a courier, drug courier involved.  And so there's no

7    question the activity involved five or more people.  I think

8    that the remaining question then is whether this defendant was

9    an organizer or leader within the group, and the Thorson case is

10   clear:  You don't have to be the head, top of the pyramid, if

11   you will, you don't have to be the organizer or leader of

12   everybody involved.  But in this particular case it was a

13   two-armed conspiracy; there was a California group involved on

14   the supply end and there was a Virginia group involved on the

15   distribution end, and the evidence at trial made it clear that

16   Mr. Howell was the head of the Virginia side of the conspiracy

17   making him an organizer or leader.

18           Among the other factors that support that, the list of

19   factors in the sentencing guidelines include the exercise of

20   decision-making authority, the nature of his participation, the

21   recruitment of accomplices, the claimed right to a larger share

22   of the fruits of the crime, and the degree of participation in

23   planning or organizing, then the degree of control or authority

24   exercised over others.  Every one of those things supports the

25   argument here.  The defendant was the one who was timing the

1  arrival of the packages with Kevin Day.  He was negotiating with

2  Kevin Day.  He was paying Kevin Day.  And when the packages were

3  coming in here, it was the defendant and Kevin Howard who were

4  going to the house to cut them up, but it was Kevin Howard that

5  the defendant had on the street mostly as the public face, the

6  public dealer.  He stayed in the background and dealt mostly

7  with the money exactly like a typical leader/organizer in a drug

8  conspiracy.

9          Of the recruitment of accomplices, the defendant here

10 recruited his own sister into the conspiracy, also recruited

11 other individuals, including some of the lower-level people we

12 heard about early on in the case.

13         And the claimed right to a larger share of the fruits

14 of the crime.  Defendant was the one who was making most of the

15 money here.  And the Court will recall, I think, some of the

16 testimony that it was Kevin Howard who was running all over

17 Hampton Roads dropping cash off in the defendant's Wells Fargo

18 account.  And so he's exactly who this guideline is meant to

19 apply to.

20         Unless the Court has other questions, that's my

21 argument.

22         THE COURT:  I do not.

23         MR. BOSSE:  Thank you.

24         THE COURT:  All right.  Mr. Broccoletti?

25         MR. BROCCOLETTI:  Yes, sir.

1          THE COURT:  So Mr. Broccoletti, without getting too

2    deep into the weeds on this at the beginning, the way I see it

3    is that his current offense level is 43, which of course results

4    in a life sentence under the guidelines.  And even if we knock

5    him back simply to a two-level enhancement for his role in this,

6    he still has a maximum sentence of life.  So you won't, you've

7    got to knock out all three of the categories under 3B1.1 in

8    order to get yourself anywhere under the guidelines.

9          MR. BROCCOLETTI:  I understand the posture of the case

10   and the predicament.

11          THE COURT:  All right.  Go ahead.

12          MR. BROCCOLETTI:  But I wanted to raise it on

13   Mr. Howell's behalf.

14          THE COURT:  Sure.

15          MR. BROCCOLETTI:  And I understand Mr. Bosse's

16   comments.  The Court is uniquely positioned, as you've heard the

17   trial, you took copious notes, were very active and involved in

18   the trial, I remember it very well.  And when you look at the

19   role in the offense, on Paragraph 24 of the presentence report

20   and the factors that are listed there and then you look at the

21   government's position paper and the factors that are listed

22   there, I agree that you can have a circumstances in which Mister

23   -- there was certainly five or more people.  I'm not arguing

24   that.  I think the issue that we're arguing is that you have a

25   buyer and a seller in that position.  You have Mr. Day as being

1  the seller, and according to the evidence, Mr. Howell is the

2  purchaser.  Mr. Howard, who the Court heard and the Court saw

3  his activities, the Court saw the texts, the Court saw the

4  pictures, the Court heard from him and what his role was, the

5  two of them, I'd suggest to the Court, are co-equal.  I don't

6  see how you can say that Mr. Howell is in a position of

7  authority or exercising anything over Mr. Howard.  I think the

8  two of them are in a co-equal position in what they did.  The

9  apartment was shared between the two of them.  Mr. Howard stayed

10 at the apartment much more.  In fact, the Court remembers the

11 defendant wasn't even in the apartment, the defendant was at the

12 Aloft Hotel, which was the subject of the suppression issue,

13 Mr. Howard was at the apartment, his belongings were found

14 there, his ID was found there.  Everything about him was found

15 there.  Some things belonged to Mr. Howell, as I think is

16 reflected in the telephone call from the jail, but essentially

17 the apartment belonged to Mr. Howard.  From there he was also in

18 charge of distributing.  He's the one that had the individuals

19 that they sold to, he's the one that recruited those

20 individuals.  Mr. Howell didn't know any of those people, I

21 think.  Most of the evidence centered on Mr. Howard being the

22 individual that would recruit them, sell to them, and the

23 defendant, they shared a particular role.  Mr. Bosse

24 characterized it as Mr. Howell directing Mr. Howard.  I think I

25 look at it from the other side of the coin, if you will, and

1   that they just shared responsibilities, one share the money, one

2   shared the distribution aspects of it.  The fact that Mr. Howard

3   was depositing money in Mr. Howell's account, again, makes

4   sense, because that's what his role was in the context of buying

5   the drugs and then just sending the money back to California to

6   sell those drugs.

7          Mr. Howard's -- excuse me, Mr. Howell certainly did

8   not recruit Ms. Laquisha McFrazier, didn't know her from Adam

9   until Mr. Day brings her into the picture and she becomes the

10  courier going back and forth.  Now, he may have been

11  communicating with her in terms of flight and schedules and may

12  have sent monies back to her, but that doesn't mean in any way,

13  shape or form that he's controlling her, organizing her, it's

14  just facilitating the distribution from one coast to the other;

15  that Mr. Day has put this ball in motion and Mr. Howard is

16  receiving the ball.

17         So under those circumstances, I do understand the

18  Court's issues with respect to the guidelines, I do understand

19  the nature and circumstances that we're in, but we still would

20  object to the enhancement role.

21         Thank you.

22         THE COURT:  Okay.  Thank you.  Well, I did hear the

23  evidence in the case, and as I recall, Mr. Howard obviously

24  shared some managerial aspects of this enterprise with Mr. Day

25  in California, and in fact I'm not entirely clear if Mr. Day was

1   in charge of manufacturing the methamphetamine that was involved

2   in this case, but there was an suggestion at some point -- I

3   don't know whether this was in argument or in evidence, but --

4   and I don't think it's relevant, but there was a suggestion that

5   Mr. Day was getting it from out of the country and then sending

6   it over here.  Regardless of that, what we had here was an

7   enterprise in which Day and Mr. Howell were involved in getting

8   drugs, moving them to the east coast from the west coast, and

9   then having a distribution network.  And Mr. Howell had, I

10  think, Mr. Howard as sort of a lieutenant, perhaps, in the east

11  coast part of this who helped him to set up distribution

12  networks.  And he and Howard, as I recall also were engaged in

13  some fraudulent activities outside of this area.  So they

14  were -- it's not as though Howard was at the very bottom of the

15  enterprise, but you know, Howell set up -- Mr. Howell set up all

16  the financial aspects of this which were quite complicated, and

17  I think that he got them to rent the apartment that they were

18  using to distribute the drugs.  So I don't think there's any

19  question that Mr. Howell was an organizer or leader of the

20  criminal activity, that it involved five or more participants.

21  So I think he's entitled to the four-point addition to his

22  guidelines for an aggravating role.  But as I noted earlier,

23  even if we say that he was something less than a big-time

24  organizer or leader and just got the aggravating role under

25  3B1.1C, which is that he was an organizer, leader, manager or

1  supervisor in the criminal activity, other than in the

2  upper-level role in three-point be 1.1A, or B.  Even if you give

3  him the lower enhancement he goes up two levels and then his

4  guidelines remain 360 months.  Now, 300 -- yes.  It's 360 months

5  to life.  So doesn't make a whole lot of difference in the long

6  run for Mr. Howell.

7          Okay.  So I'm going to not change the guidelines

8  calculation in this case.

9          Let's see.  Here's the way the guidelines work out on

10 this:  The base offense level is 40 based on the drug weight.

11 He gets two additional points for the Section 1956 conviction,

12 plus four because he's an organizer, which leads to an adjusted

13 offense level of 46.  He doesn't get any points off for

14 acceptance of responsibility, although I've got to say that, you

15 know, if Mr. Broccoletti had asked me to take points off for

16 acceptance of responsibility I would have given it to him,

17 because Mr. Howell made a motion to suppress.  If the government

18 had allowed him to preserve that issue on appeal, we wouldn't

19 have had to have a trial on the case.  I understand the

20 government's position on it.  But it's not as though Mr. Howell

21 was kicking and screaming his innocence in this case.  He waived

22 the jury in the case, we got the trial done with great dispatch,

23 so I would have given him three points off for responsibility,

24 but none of that would have made any difference either, because

25 the maximum guideline level you can get is 43 for an offense

1    level.  So that's what he would have had.  His criminal history

2    category has four points, which makes him a category III.  The

3    guideline sentence range suggested is life.  Of course that's

4    advisory only.

5             I did receive a number of letters from Mr. Broccoletti

6    regarding Mr. Howell's character, and I'll tell you who they are

7    from.  Clarke Reilly.  D'Shara Diggs.  Lena Collins.  Raven

8    Adams.  Xylina Lipscomb.  Marcelle Lewis.  Ronica Howard.  And

9    these letters, you know, bring to light a different side to

10   Mr. Howell.  Essentially they disclose that he's been helpful to

11   a lot of people in a lot of different ways.  He's provided

12   financial assistance to people.  He has provided encouragement

13   to people when they've been down on their luck.  He has been

14   loving to family members.  He has been supportive in his

15   community.  The one time when he provided T-shirts to a bunch of

16   people who couldn't provide them for some event.  He has helped

17   young people get on with their careers.  He helped a fellow

18   named Kee'vin Lewis, whose stage name is LBS Kee'vin, to become

19   a rapper.  And Veronica Howard is Kee'vin Lewis's mother.  And

20   Kee'vin Lewis is, in fact, a real rap artist whose music I have

21   listened to preparing for court today.  And apparently he's

22   quite accomplished in this field.  So you know, Mr. Howell

23   apparently had some -- you know, it's hard for me to know from a

24   distance what his true role was in the entertainment industry,

25   but he at least helped LBS Kee'vin get his career going.  So he

```
 1   had, in addition to all this drug business, a legitimate

 2   enterprise that he was participating in, and participating in

 3   such a way that helped new people in the music industry.

 4           All right.  Now, the government and Mr. Howell have

 5   both moved for a variance in this case.  Do we have any victims

 6   that want to make a statement today?

 7           MR. BOSSE:  No sir, Your Honor.

 8           THE COURT:  All right.  And do you have any witnesses

 9   you want to call today?

10           MR. BROCCOLETTI:  No witnesses.  The government made a

11   reference in its position paper to a post the defendant had made

12   on, I guess on Instagram, I don't know, but they make reference

13   to a post.  I have the post if the Court wants to read it if

14   it's of any concern.

15           MR. BOSSE:  I have no objection to that.

16           THE COURT:  I'll take a look at it, sure.  Thank you.

17           I'm looking at a document called Defendant's

18   Exhibit 1.  Okay.

19                   (Defendant's Exhibit No. 1 received in

20               evidence.)

21           (Pause in the record.)

22           THE COURT:  All right.  So this is -- I have received

23   this as Defendant's Exhibit 1, and it's a post in which

24   Mr. Howell talks a little bit about his trial and the fact that

25   he's disappointed that more of the people that he helped in his
```

13

1  life didn't support him and that some of the people that he

2  helped in his life testified against him.  And I'll receive

3  that.  And it's kind of understandable.

4         MR. BROCCOLETTI:  Other than that, Judge, we have no

5  evidence.

6         THE COURT:  Are any of the people who wrote letters

7  here today?  All right.  Some of them are.  Two of them are.

8  Thank you both for writing.

9         All right.  So I will hear then from Mr. Bosse and Mr.

10 Broccoletti on the motions for a variance, 3553(a) factors and

11 the appropriate sentence.

12        Go ahead, Mr. Bosse.

13        MR. BOSSE:  Thank you, Judge.  When I ask for a

14 variance I'm supposed to be able to point to something in the

15 record that --

16        THE COURT:  Well, what you're saying is it's just too

17 high.

18        MR. BOSSE:  Essentially, Your Honor.  I looked back at

19 the other cases that we had done --

20        THE COURT:  Yeah.  Life is too much in this case.

21        MR. BOSSE:  Well, the case that I found that was

22 closest to it was the case of Derrick Twiddy.  And it's funny,

23 the methamphetamine amount was almost exactly the same.

24 Mr. Twiddy was essentially a middle-man for a cartel, Mexicans,

25 and importing it here.  He was not as involved as far as we knew

1   as Mr. Howell in running a distribution conspiracy with this

2   many people.  He also pled guilty before trial.  And I

3   understand the Court's notes about that, but I'll say that the

4   defendant certainly doesn't sound like someone who is admitting

5   his guilt in this Instagram post.  He complains about the

6   evidence that he saw and having never seen these witnesses, and

7   then complains about having to watch people that he -- whose

8   lives I changed and that he looked out for, take the stand

9   against him.  I mean, the people he's talking about here are his

10  co-conspirators, Kevin Howard and his own sister.  And the fact

11  that he's complaining about that is galling, because he brought

12  his sister in particular into this, and she's in BOP right now

13  doing federal time because of him.  And the fact that he is

14  going to complain about her coming to try to help herself out, I

15  don't think this speaks anything about someone who has actually

16  accepted responsibility, or someone who is anything but

17  disappointed that he's been caught in what he's been doing.

18          THE COURT:  Well, he didn't get up and take the stand

19  and deny it and they didn't bring a bunch of witnesses in that

20  he had ponied up to testify that he had a minor role.

21          MR. BOSSE:  That's true, Your Honor.

22          THE COURT:  It was pretty clear to me essentially the

23  only reason there was trial in this case was because he wasn't

24  able to plead guilty and maintain his right to appeal his

25  suppression hearing.  And the suppression hearing was -- you

15

```
 1   know, I ruled against him on it, but it wasn't the worst
 2   suppression motion I've ever seen.  It had some colorable merit
 3   to it.  And you know, maybe he'll get reversed.
 4             MR. BOSSE:  Yes, sir.  No, I understand that.  What I
 5   was trying to note is that --
 6             THE COURT:  Yeah.
 7             MR. BOSSE:  -- the post that he made doesn't -- I
 8   mean, it doesn't evince any sort of -- the person that he's sad
 9   for here is himself, and that the people -- and he -- you know,
10   it's a common human statement that your friends are with you
11   when you're up and then when you're down, they're not.  But
12   complaining about that, and complaining about the fact that
13   these people that he so-called helped testified against him,
14   cooperated against him.  And again, that's his sister, his own
15   sister, his younger sister, that he brought into this.  And of
16   all the factors in the case outside the actual drug conspiracy,
17   that's, I think, one of the most aggravating.
18             The drug conspiracy --
19             THE COURT:  Well, but as I recall he sent some sort of
20   a message to his sister telling her, you know, you've got to
21   take care of yourself.  And I think that's what she was doing
22   there at that point.
23             MR. BOSSE:  I'm sure that's what she was doing, yes,
24   sir.
25             THE COURT:  And that was, you know, that was advice
```

1    that he gave her that wasn't helpful, that he knew wouldn't be

2    helpful to himself, but he did it and, well, it didn't help him,

3    did it?

4            MR. BOSSE:  The result is as it was.

5            THE COURT:  Yeah.

6            MR. BOSSE:  The actual drug conspiracy here, Your

7    Honor, was a significant methamphetamine conspiracy with

8    extremely high-purity meth.  The Court got to see photographs of

9    what this meth looked like.  This is the new, this is the new

10   trend, this is -- essentially the market for meth has been

11   completely crowded out by synthetic high-purity methamphetamine

12   coming from usually the west coast, ultimately, usually from

13   Mexico.  And as that meth type has taken over in Virginia and

14   across the country, the overdoses from meth and meth addiction

15   rates are up dramatically.  The overdose, fatal overdose rate

16   for methamphetamine in this state since 20007 is up

17   6,000 percent since 2007, which tracks the rise of this

18   higher-purity meth.

19           You know, methamphetamine is not just -- people used

20   to call it hillbilly heroin because of the stereotypes about the

21   people who used it and the affect that it had, but this is a

22   widespread drug, and it's extremely potent in the form that it's

23   in here.  It leads to psychosis, mental health disorders,

24   besides the physical effects that it has on your heart, your

25   renal, your kidney system and other systems, and there's an

1    overdose risk from it too.

2            Meth is interesting also because there's no cure for

3    meth addiction.  There's no replacement or management system as

4    there is for heroin and fentanyl where we have methadone and

5    Saboxone and those kind of treatment availabilities are not

6    available for meth.  Once you're hooked on meth, you're going to

7    beat it on your own, which is very hard to do, or you're not

8    going to beat it.

9            This case also involved fentanyl.  And again, we have

10   the defendant and Mr. Day using other people to do their dirty

11   work; in this case, using women to smuggle fentanyl in their own

12   bodies on commercial flights.  And every drug case involves some

13   depravity, some level of depravity, and there's some level of

14   using people as objects and not as ends in themselves, and that

15   was certainly the case here as evidenced by the way the drugs

16   were brought in, the way the fentanyl was brought in.  And you

17   compare that to the text messages the defendant sent.  The

18   celebratory Tom Brady messages for a touchdown when the drugs

19   came in.

20           And you know, this is not some side hobby of his where

21   he's mostly doing other things, this is, this is the defendant

22   and his team doing massive amounts of drug trafficking in this

23   area.  And you know, he was also back and forth from Atlanta.

24   And we didn't really -- this case didn't get into the Atlanta

25   portion of whatever was happening.  He brought his own sister

1   into it.  He possessed a gun with Kevin Howard.  And the case is

2   tied to a major California Crips gang.  And so it has every

3   element of the most serious types of drug conspiracies:  A gang

4   tie, interstate trafficking, firearms, and a network of dealers

5   pumping this drug in the local area.

6           The defendant is very intelligent.  He had been doing

7   this and the fraud conspiracy for years.  I think he was charged

8   once with fraud but it was *nolle prossed* in the state.  And so

9   he's been getting away with it for years and years.

10          His record, for having been involved essentially in

11  day-to-day crime for many years, is not as dramatic as some of

12  the other people the Court's seen.  He does have a prior drug

13  conviction.  He's got an assault and battery on a law

14  enforcement officer, both charged in the state, and did not

15  deter him in the least from going down this path.

16          He's also been shot before in New Jersey in his youth,

17  and again, did not turn away from the streets and, in fact,

18  seems to have made the transition from primarily white-collar

19  crime into this harder type of crime.

20          I've made all the other arguments and most of these

21  arguments in the paper.  But this is a serious case.  He was at

22  the apex of a significant group, and the ties that he had to the

23  gang world, to possession of firearms, I mean, all the

24  aggravating factors that are at the root of so much of the crime

25  in South Hampton Roads here present in this case.  And unless

1    the Court has further questions, that's my argument.

2              THE COURT:  I do not.  Thank you very much.

3              MR. BOSSE:  Thank you.

4              THE COURT:  Mr. Broccoletti?

5              MR. BROCCOLETTI:  Yes, sir.

6              I appreciate the Court's comments about the quality of

7    our motion to suppress.  I'd start with that.  Thank you.

8              THE COURT:  Oh, you're welcome.  You did a good job on

9    it.

10             MR. BROCCOLETTI:  Your Honor, we did move for a

11   variance in this case, and I think that our position paper sets

12   forth a number of those reasons as to why.

13             Focusing on the 3553(a) factors, obviously it's a very

14   significant offense and a serious offense, and we don't make any

15   light of that.  We're not challenging that.  Obviously there's

16   issues about deterrence, protecting the public from further

17   crime, providing the defendant with needed educational or

18   vocational training, things of that nature.

19             In this particular case, Mr. Howell is 35.  If the

20   Court imposes a sentence commensurate with our recommendation,

21   he'll be in his mid 50s before he's released from custody.  As

22   the Court knows, individuals age out of criminal conduct.  We

23   think that's a significant factor for the Court to consider.

24             Also, the fact that the last significant convictions

25   that he's had occurred some 13 years ago back when he was young,

1  when he was 22.  I know counsel refers to a number of activities

2  that allegedly the defendant was involved in with some fraud,

3  and I think some of that evidence came out during the course of

4  the trial.  But a fraud pales in comparison to what we're here

5  for, I'd suggest.

6           THE COURT:  Right.

7           MR. BROCCOLETTI:  But there's no record of him having

8  been arrested or convicted of any of those other offenses during

9  that period of time.

10          And as the presentence report reflects and as our

11  position paper reflects and as the letters reflect, he's been

12  very successful.  And the Court noted -- and again I commend the

13  Court for listening to that one particular artist, I did not

14  take the opportunity to do that -- but there are other artists

15  that are present in the courtroom today that he has supported

16  and that he has started as well, as well as other friends and

17  family members and people from all over the country in all

18  different professions.  And I think that their presence to the

19  Court today indicates really who Mr. Howell is, who he can be,

20  and what he can accomplish, because he's done that before.  He

21  made a left turn instead of a right turn, unfortunately.  I

22  think that if he had stayed on with respect to the music he

23  would have been even more successful and people would have been

24  more fortunate to have had them in his life for helping him.

25          By all accounts he's a wonderful father, supports his

1  daughter, sees his daughter on a monthly basis.  The Court has a

2  letter from the child's mother indicating how involved he is.

3  He'll continue to be involved and stay involved.  And again,

4  that's who he is.  That's the type of person that he is.

5        So we think that, based upon his age, based upon the

6  lack of a record for the past 13 years -- the medical conditions

7  that he suffers from as well.  He has some significant health

8  issues.  He's been fortunate with respect to COVID over the last

9  two years and not gotten seriously, seriously ill with that, but

10  I think that his medical condition would warrant some treatment

11  hopefully through the Bureau of Prisons and some of the medical

12  facilities that they have.  But I think that that also is a

13  factor under his history and characteristics that could support

14  a variance.

15        And I think, again, the sentence that the Court

16  imposes on Mr. Howard, I know it's 100-some-odd, 90 months, I

17  know Mr. Howard pleaded guilty and received a three-level

18  reduction for acceptance of responsibility, but I think that the

19  Court saw that Mr. Howard, while the Court may have

20  characterized him as a lieutenant, he was certainly a senior

21  lieutenant, and --

22        THE COURT:  I was going to say he was the first

23  lieutenant.

24        MR. BROCCOLETTI:  First lieutenant.

25        THE COURT:  He wasn't a second lieutenant.

1           MR. BROCCOLETTI:  Yes, sir.  And I think that the

2   sentence the Court imposes upon him also reflects a range in

3   which this defendant should be in.  We certainly appreciate the

4   Court's comments about the defendant.  And the Court is

5   absolutely right, that if a conditional plea were on the table,

6   that we would have had that and we wouldn't have gone to

7   trial --

8           THE COURT:  Right.

9           MR. BROCCOLETTI:  -- and I think we tried to do

10  everything we possibly could in waiving a jury.  So we'd ask the

11  Court to take all those factors into consideration.

12          THE COURT:  Thank you, Mr. Broccoletti.

13          Mr. Howell, you now have the opportunity to stand up

14  and tell me anything you want me to think about in sentencing

15  you.

16          THE DEFENDANT:  How you doing, Mr. Gibney?

17          THE COURT:  I'm all right.  Thank you.

18          THE DEFENDANT:  I waited about two years to have

19  something to say in this whole situation, and...

20          THE COURT:  This is your chance.

21          THE DEFENDANT:  This is my chance.  I wrote probably

22  about 10 letters to say to you and try to recite it, but I ended

23  up just saying I'm going just going to speak straightforward.

24          I understand the government's position.  I understand

25  Mr. Bosse's job.  I feel no ill will.  I understand what he has

1   to do to further the law.  One of my biggest decisions here was

2   to push forward to get to the trial part because of what you

3   said at my motion hearing as far as the Chesapeake Police

4   Department, you figure their policy was kind of conflicting with

5   the way citizens was being addressed.  Numerous times while the

6   Court was being continued I wanted to do the conditional plea

7   and we kept trying.

8          And to the note of my sister, I do take responsibility

9   for bringing her involved in this situation.  She -- I'm a

10  person that takes responsibility and understands that a man has

11  to step up and take responsibility for the things that he does

12  and the situations that he put his self into.  So with that, I

13  just wanted to let that be known to Mr. Bosse and Mr. Gibney.

14          THE COURT:  All right.  Thank very much.

15          THE DEFENDANT:  All right.  Appreciate it.

16          THE COURT:  So you can sit down, Mr. Howell.

17          Mr. Broccoletti, do you know the identities of all

18  these many people who are here today?

19          MR. BROCCOLETTI:  I do not, Your Honor I'm sorry.

20          THE COURT:  Well...

21          MR. BROCCOLETTI:  He does.  Mr. Howell does.

22          THE COURT:  That's all right.  Do you want to

23  introduce them to me Mr. Howell?

24          You need to come up to the microphone here so I can

25  hear you.

1           THE DEFENDANT:  Your Honor, pretty much the whole

2   courtroom.  My mother.  Xylina.  Chris Copeland, plays for the

3   Knicks.

4           THE COURT:  Plays for the Knicks?

5           THE DEFENDANT:  Yeah.

6           THE COURT:  The New York Knicks?

7           THE DEFENDANT:  Yeah.

8           THE COURT:  He plays now for the New York Knicks?

9           THE DEFENDANT:  No.  He played for them.

10          THE COURT:  Oh, he doesn't play for them anymore?

11          THE DEFENDANT:  No.

12          THE COURT:  Okay.

13          THE DEFENDANT:  Aragon (phonetic), which is a very

14  good artist.  Arsonal Da Rebel, my best friend, one of the most

15  top-listened artists in the world.  You can look that up also.

16          THE COURT:  What's his name?

17          THE DEFENDANT:  Arsonal Da Rebel.

18          THE COURT:  Arsonal Da Rebel?

19          THE DEFENDANT:  Yes.

20          THE COURT:  How do you spell Arsonal?

21          THE WITNESS:  A-r-s-o-n-a-l.

22          THE COURT:  Arsonal Da Rebel.  Okay.  Like... Okay.

23          THE DEFENDANT:  Yeah.  A good friend of mine, Khaotic.

24  My uncle, Derrick Howell.  My first cousin, big sister Tiffany

25  Howard.

1    THE COURT:  All right.  Got a letter from her.

2    THE DEFENDANT:  Yeah -- that's Ronica Howard.  That's

3  Tiffany Howard.

4    THE COURT:  Okay.

5    THE DEFENDANT:  My little cousin, Engimay (phonetic)

6  Burnett.  My friend Lola.  I can't see who else -- and my sister

7  Simoya Howell, my best friend.

8    THE COURT:  All right.  Great.  Thank you, sir.  You

9  may be seated.

10    So let me say to all of you, thank you very much for

11  coming here today.  You have no idea how many people I see and I

12  sentence who are seated exactly where he is, and the only person

13  on their side in the case is their lawyer.  So it's, you know,

14  having you here tells me a lot of things.  You know, it's very

15  important to Mr. Howell to have you here to see that his people

16  have not deserted him in this moment of need.  And at some state

17  Mr. Howell's not going to be in jail anymore, he's going to be

18  out, and he's going to need people to support him as he tries to

19  resurrect his life, and it's helpful to know that all of you are

20  here and will be there for him at that time.

21    All right.  Let me go through the 3553(a) factors in

22  this case.

23    First, the nature and circumstances of the offense.

24  Well, we've heard a lot about it today.  The Crips, a gang,

25  street gang, had an enterprise in California that involved

1  selling large quantities of methamphetamine.  One of the people

2  who helped them sell that was Mr. Howell.  He was in charge of

3  an operation here in Virginia, and there were a large number of

4  shipments of methamphetamine here in the form of Ice, a very

5  pure form of methamphetamine.  He was credited with the

6  less-pure form in the presentence report, but whether it was

7  pure ice or just regular methamphetamine, it was a lot of drugs

8  that came here.

9         He and his colleague, Mr. Day, got a postal clerk

10  named Ms. McFrazier to mail a lot of it here and ultimately to

11  transport, McFrazier and other women to transport heroin and

12  fentanyl in condoms that they had stuck inside themselves.

13         He had his sister help him with the drug enterprise in

14  terms of the aspects that were done here of receiving it and

15  having a place to cut the drugs and package it and so forth.

16         He had firearms.  He had -- you know, this whole thing

17  was a pretty well-organized enterprise.

18         I was particularly impressed with the various devices

19  that Mr. Howell used to essentially hide the money and to move

20  it to himself and others through various channels so it was hard

21  to trace and to move it to the west coast.  By no stretch of the

22  imagination was this enterprise limited to Norfolk, Virginia

23  area.

24         His criminal history is that he has a number of

25  convictions.  Most of them are not major.  He does have one

27

1   prior drug offense.  He was involved in some fraud schemes with
2   Mr. Howard, and I'm not sure whether that actually resulted in a
3   conviction.  And I never did hear exactly what it was that they
4   were doing.  Howard testified about that without a lot of
5   detail.
6          His personal history is that his father was unknown,
7   essentially, in his life.  His mother moved away from him --
8   they were living in New York at the time, she moved down to
9   Virginia, he was left on his own in New York when he was 17.  He
10  was living in a pretty tough neighborhood in Queens, and as I
11  think somebody put it in the presentence report, that's when he
12  started his street life.  He developed eventually some ties with
13  the Crips.  There's no evidence that he was actually a member of
14  the Crips, but he clearly was doing their -- working with them
15  in the distribution of drugs here.
16         He's not married.  He has one child.  He has a pretty
17  good relationship with her.  He has been paying voluntary
18  support.
19         Physically, his situation is that he is unfortunately
20  overweight, which has some impacts on his health.  You know,
21  same thing that most -- many overweight people have, he's got
22  heart problems, circulatory problems, back pain, things that
23  come from his overall condition.  And he takes a number of
24  prescription medications to deal with those.
25         Educationally, he needs to get a GED.  And one of the

1    things that's interesting is that, notwithstanding his lack of

2    formal education, he knows more about how our banking industry

3    works than I do.  Now, that's not saying much, because I have a

4    pretty simple life.  I have a checking account and a savings

5    account and that's about it.  And he's got -- I was amazed in

6    this case at the mechanisms that they had to move money around.

7    But in addition to that, you know, he's got some skills that

8    came into play.  He had a car business.  I'm not sure how that

9    panned out for him, but clearly in the music business he knew

10   some people and he was able to help folks get on with their

11   career.  He's been sporadically employed throughout his life in

12   these kinds of surprises.

13           The next factor is the need for the sentence to

14   reflect the seriousness of the offense.  Well, you know, I don't

15   think anybody's denying that this is a very serious offense.

16   It's an addictive drug.  Even when it doesn't kill somebody due

17   to an overdose, it leads to death because people's lives are

18   ruined.  They become addicts and they just don't thrive.  It's a

19   very serious offense.

20           The next factor is the need to promote respect for the

21   law.  And Mr. Howell has shown none of that here.

22           The next factor is the need to provide for just

23   punishment.  As I said earlier, the Federal Sentencing

24   Guidelines suggest that I impose a life sentence on Mr. Howell.

25   I happen to think that's too high.  But that reflects, I think,

1   the seriousness of the offense and what the Sentencing

2   Commission thinks is a just punishment in this case.

3          The next factor is the need to afford adequate

4   deterrence.  As far as general deterrence goes, anything I do

5   today, if I gave Mr. Howell five life sentences, it would not

6   deter other drug dealers.  As soon as Mr. Howell was off the

7   street, I can promise you the Crips found somebody else to bring

8   their methamphetamine into Virginia.  It's just sad the way this

9   whole thing works.  And these long sentences we give out don't

10  really deter people.  I hope that it'll be the lesson Mr. Howell

11  needs and he'll have opportunities to help himself as time goes

12  on.  I hope that he'll recognize that this is just no way to

13  live.

14         The next factor is the need to protect the public from

15  further crimes the defendant.  Obviously that's important, given

16  the nature of the drugs he was bringing in.

17         Next factor is the need to give him education and

18  vocational training, medical care and other treatment.  I'm

19  going to recommend that the Bureau of Prisons put him in a

20  facility where they can provide medical care he needs.  I must

21  say that I don't think his medical condition is such he needs to

22  be at a hospital, but he does need to be in a place that has

23  pretty good medical care.  I think many of the federal prisons

24  have that.

25         Next factor is the kind of sentences available.  On

1   Count 1 there's a maximum of life, a mandatory minimum of 10

2   years, a fine of $10 million.  Count 2, maximum of life,

3   mandatory minimum of 10 years and another fine of $10 million.

4   Count 3, a maximum of 40 years, a mandatory minimum of five, and

5   a possible fine of $5 million.  Count 4, a maximum of 20 years,

6   a mandatory -- there is no mandatory minimum, and a fine of

7   $500,000.

8           I am to take into account the guidelines that suggests

9   a life sentence for him.  I'm to avoid sentencing disparities

10  among similarly situated defendants.  And you know, the

11  sentences that I've imposed on other people in this scheme have

12  not been short.  You know, the postal worker from California got

13  98 months, which is eight and a half years.  Mr. Howell's sister

14  got eight years.  Kevin Howard got 192 months, which is 16

15  years.  And you know, Mr. Howell is at the, is higher up in the

16  hierarchy of this offense than they were, so his sentence will

17  be higher than theirs.  And I note that even a life sentence

18  would not be out of line given sentences that other people have

19  gotten with the amount of drugs in this case, although I'm not

20  going to do that.

21          There is no restitution involved here.

22          There are two motions for a variance.  The government

23  requests a 30-year sentence, 360 months, and notes that there's

24  no, you know -- I guess if I had to say what the reason is, I

25  think I tried to say it earlier, is just that life is too much

1   for what Mr. Howell did.  And the government noted that he's not

2   been involved in any violent crimes.

3          The defense asks for a 20-year sentence because he did

4   try to plead to this, but -- and I don't blame him for this --

5   wanted to appeal my ruling on his suppression motion.  But the

6   defense also notes his age at release, the legitimate work he

7   has done in his life, and the impact he's had on people in his

8   family.  So I am going to vary downwards some in this case.

9          All right.  Mr. Howell, please stand up.

10          Pursuant to the factors set forth in 18 U.S. Code

11  Section 3553(a) and the Sentencing Reform Act of 1984, and

12  having considered the Federal Sentencing Guidelines as advisory,

13  it is the judgment of the Court that you're hereby committed to

14  the custody of the Bureau of Prisons to be imprisoned for a term

15  of 360 months with credit for time served.  This consists of 360

16  months each on Counts 1, 2 and 3, and 240 months on Count 4, to

17  be served concurrently.  This is sufficient but does not exceed

18  the amount of time necessary to achieve the goals of sentencing

19  as set forth in 18 U.S. Code 3553.  It reflects the seriousness

20  of the offense, promotes respect for the law, provides just

21  punishment, affords adequate deterrence, and protects the public

22  from further crimes you may commit.

23          I recommend that you participate in any education or

24  vocational training offered by the Bureau of Prisons.

25          Mr. Broccoletti, I'm going to recommend that he be

1    housed somewhere.  Would he rather be housed somewhere close to

2    Norfolk or somewhere close to Atlanta?

3              (Counsel and defendant conferred.)

4              MR. BROCCOLETTI:  Norfolk, Your Honor.

5              THE COURT:  Norfolk?  All right.

6              I recommend that the Bureau of Prisons assign you to a

7    facility as close as possible to Norfolk.

8              Upon release from imprisonment, you will be placed on

9    supervised release for a term of five years.  This consists of

10   five years on Counts 1 and 2, and four years on Count 3, to be

11   served concurrently.

12             Within 72 hours of release from the Bureau of Prisons,

13   you will report to the probation office in the district in which

14   you are released.

15             While on supervised release, you will not commit any

16   federal, state or local crime, you will not possess a controlled

17   substance, you will not possess a firearm or destructive device.

18             You will comply with the standard conditions of

19   supervised release as recommended by the U.S. Sentencing

20   Commission.

21             And you will not open credit cards, credit lines,

22   lines of credit, without the permission of your probation

23   officer.  You will provide the probation officer access to any

24   financial information about yourself.

25             You don't have any minor children at the time, so

1    that's not really a factor.

2         I have considered your net worth and liquid assets,

3    your lifestyle and financial needs, and I find that you're not

4    capable of paying a fine, so no fine will be imposed.

5         As to each count, however, you must pay a special

6    assessment in the amount of $100, technically due in full

7    immediately.  When you get out on supervised release you can pay

8    it in the amount of ten dollars per month until paid in full.

9    It becomes a special condition of your supervised release.

10   Those payments will start 60 days after you're released to allow

11   you to get your feet on the ground.

12        Is there forfeiture on this?

13        MR. BOSSE:  No, sir, Your Honor.

14        THE COURT:  Okay.  Sir, you have 14 days to appeal

15   this sentence to the U.S. Court of Appeals for the Fourth

16   Circuit.  If you want to do that, you let Mr. Broccoletti

17   know -- well, I think you are going to do that.  You let Mr.

18   Broccoletti know and he will file the notice of appeal.  If you

19   can't afford to have Mr. Broccoletti handle your appeal, they'll

20   appoint a lawyer for you.  You don't have to pay a fee to file

21   the notice of appeal if you can't afford to.

22        All right.  Anything else, Mr. Bosse?

23        MR. BOSSE:  No, sir, Your Honor.

24        THE COURT:  Anything else, Mr. Broccoletti?

25        MR. BROCCOLETTI:  No, Your Honor.  Thank you.

34

1          THE COURT:  All right.  Mr. Howell, sir, good luck and

2   God bless you in this.

3          Let's recess court until we got the next case ready to

4   go.

5          (Whereupon, proceedings concluded at 11:17 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

```
1                        CERTIFICATION

2

3          I certify that the foregoing is a true, complete and

4    correct transcript of the proceedings held in the above-entitled

5    matter.

6

7          _____

8                    Paul L. McManus, RMR, FCRR

9                         _____

10                            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```